**Berneda McLEAN and Fredericka Marksheffel, Appellants,**

**v.**

**STATE of Alaska, Donald Harris, Commissioner, Department of Public Works, William R. Hudson, Director Division of Marine Transportation and all of their agents and employees, Appellees.**

**No. 3421.**

Supreme Court of Alaska.

Sept. 15, 1978.

---

Timothy H. Stearns, Anchorage, for appellants.

Dickerson Regan, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellees.

## OPINION

Before RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ., DIMOND, J. Pro Tem.

DIMOND, Justice Pro Tem.

Prior to July 1, 1975, positions in the steward's department of the Division of Marine Transportation (hereinafter "ferry system") were sex segregated. In the steward's department, waiters and utility workers were exclusively male; matrons, exclusively female. On the six vessels of the ferry system, there were 48 males in the waiter and utility categories and 10 females in the matron category.

Plaintiffs-Appellants, Berneda McLean and Fredericka Marksheffel, applied for employment on the ferry system vessels. Later, they filed complaints in the superior court, claiming that they were discriminated against because of sex, in that males who applied for work at a later date were hired first, instead of the plaintiffs. Their complaints asked for immediate employment with the ferry system, seniority status dating from the dates they sought employ-

ment, and back pay. In addition, McLean asked for wages equivalent to what the male employees were being paid.

Both sides moved for summary judgment on the limited issue of liability. The plaintiffs requested that the superior court declare that the ferry system's hiring policy of maintaining sex-segregated positions constituted unlawful employment discrimination. The ferry system admitted that its hiring practice was discriminatory. Nevertheless, the ferry system moved for summary judgment alleging that its hiring practice was within the statutory exception to unlawful employment discrimination. The superior court entered a summary judgment in favor of the ferry system, and plaintiffs have appealed.

Discrimination in employment on account of sex and other factors is forbidden by statute. AS 18.80.220(a)(1) states:

(a) It is unlawful for

(1) an employer to refuse employment to a person, or to bar him from employment, or to discriminate against him in compensation or in a term, condition, or privilege of employment because of his race, religion, color or national origin, or because of his age, physical handicap, sex, marital status, changes in marital status, pregnancy or parenthood *when the reasonable demands of the position do not require distinction* on the basis of age, physical handicap, sex, marital status, changes in marital status, pregnancy or parenthood; (emphasis added)

The purpose of this anti-discrimination law has been expressly stated by the legislature. AS 18.80.200 provides:

(a) It is determined and declared as a matter of legislative finding that discrimination against an inhabitant of the state because of race, religion, color, national origin, age or sex is a matter of public concern and that such discrimination not only threatens the rights and privileges of the inhabitants of the state but also menaces the institutions of the state and threatens peace, order, health, safety, and general welfare of the state and its inhabitants.

(b) Therefore, it is the policy of the state and the purpose of this chapter to eliminate and prevent discrimination in employment, in places of public accommodation, in housing accommodations and in the sale or lease of unimproved property because of race, religion, color, national origin, or, in the case of employment, because of sex or age.

As we stated in *Loomis Electronics Protection, Inc. v. Schaefer,* 549 P.2d 1341, 1343 (Alaska 1976):

In view of the strong statement of purpose in enacting AS 18.80, and its avowed determination to protect the civil rights of all Alaska citizens, we believe that the legislature intended to put as many "teeth" into this law as possible. (footnote omitted).

■ The only exception to the statutory requirement prohibiting discrimination is that discrimination—in this case on the basis of sex—is permitted only "when the reasonable demands of the position" require distinctions on the basis of sex. But this is not an easy escape valve from the anti-discrimination policy of the statute. The word "demands" means, we believe, something more than mere "requirements." The connotation we place on "demands" is that of requirements or necessities that are of an urgent nature.[1] Furthermore, this connotation is necessary to effectuate the legislature's purpose "to eliminate and prevent discrimination in employment." Without such a connotation, all but the most blatant discriminatory plans would be excused even if they perpetuated the effects of past discrimination.

■ Since we have held that the legislature intended "to put as many 'teeth' into the law as possible," we shall construe the statutory exception strictly against the one who seeks to utilize it. In addition, we shall place on the one seeking to utilize the exception the burden of proving by clear and convincing evidence that the exception

---

1. *See* The American Heritage Dictionary at 350 (1973).

to the antidiscrimination policy is amply justified.[2] With these principles in mind, we now examine the ferry system's attempted justification of its discrimination in employment against the plaintiffs.

The affidavit of William Hudson, Director of Marine Transportation, states that it is the ferry system's "belief that women should not be assigned to the heavy lifting of the utility position." The affidavit of James Stansbury, Director of Hiring for the steward's department, states that utility men were required to haul "heavy" garbage cans and large bundles of dirty laundry (usually over 100 pounds).

But there has been no showing by the ferry system that women in general, or that plaintiffs in particular, are not capable of doing this work.[3] In fact, the ferry system stated that it "does not claim that no individual [sic] women could perform those heavier duties." Furthermore, even assuming that plaintiffs could not carry a 100-pound bundle of laundry, a reasonable alternative is readily seen. There is no reason given by the ferry system that the laundry could not be placed in bundles of less than 100 pounds.

Apparently, the ferry system felt that there was a limitation on hiring women in the steward's department because of lifeboat training. For example, the affidavit of Robert E. Lee, the port captain and charged with some hiring responsibility for the ferry system, states that a certain number of lifeboat men are required by Coast Guard regulations and, with employee turnover, this often is a problem. But there was no indication that females could not obtain certification or that there was a training limitation. In fact, plaintiff Marksheffel's application showed that she possessed a lifeboat certificate. In addition, plaintiff McLean also possessed a certificate, although this fact was not before the superior court at the time it rendered summary judgment in favor of the ferry system.

There was reference to a problem created by the use of toilet and shower facilities by members of the same sex. But Hudson's affidavit admits that in 1973 the United States Coast Guard regulations "liberalize[d] certain provisions requiring separate toilet and working facilities [for men and women crew members]." The stated purpose of the change in the Coast Guard regulation [4] was:

> The purpose of these amendments to the shipping regulations is to allow female members of the crews of vessels to use washrooms and toilet rooms that are also used by male members of the crew. . . [5]

Hudson's affidavit also states that there was a need for men to perform cleanup in men's toilet and shower rooms, without the necessity of shutting the rooms off. However, no reason was given for the necessity. In fact, the same argument could be made as to men performing cleanup in women's toilet and shower rooms. The obvious solution, of course, would seem to be that women could perform the work in women's restrooms, and men in men's restrooms.

The above-mentioned "problems" of employing women in the steward's department on the ferries are not such as to permit

2. *Brown v. Wood*, 575 P.2d 760, 768 n. 11 (Alaska 1978).

3. In fact, since 1975 women have been performing the duties of the utility position.

4. 38 Fed.Reg. 204–48 (1973).

5. In the post-hearing memorandum, the ferry system pointed out that even though the Coast Guard changed its requirement, the change was not significant because the state's subchapter 2, Industrial Housing Code, Occupational Safety and Health Standards, art. I, § 02.-105(c)(1)(A), required separate toilet facilities for each sex. The ferry system, however, presently allows males and females to share the same facilities. The ferry system admits that it is in violation of this requirement and, on appeal, does not argue that the requirement is mandatory. Furthermore, Stearn's affidavit states that he talked with Stan Godsoe, chief of compliance, OSHA, who told him that the ferry system is governed by the Coast Guard regulations and that, in Godsoe's opinion, the Alaska Industrial Housing Occupational Safety and Health Standard do not apply to the ships of the ferry system.

discrimination against women. In fact, in its brief on appeal, the ferry system apparently admits this.

The State does not argue that problems over other matters, such as heavy lifting, or lifeboat certificates, or the need for men to perform clean-up work in men's toilets and shower rooms, and vice versa, standing alone, were a full legal justification for establishing certain men's jobs and certain women's jobs.

But what the ferry system does argue as a justification for its discriminatory practices was the problem of berthing in the steward's department for members of the opposite sex. The affidavits of Hudson and Stansbury state that the state's present vessels were constructed for separation of the sexes, and that to make structural changes in the ship to accommodate the relocation of the steward department would cost at least $400,000.

Since July 1, 1975, the ferry system has taken steps that it considers "unreasonable." It presently permits men and women in the steward's department to share the same staterooms which contain more than one bed. But the ferry system is most unhappy about this arrangement. For example, it quotes in its brief on appeal from the affidavit of Stansbury as follows:

Later experience with mixing of sexes in sleeping quarters has proven to be highly disruptive to operation of the ferry system. Both women and men have refused to share their sleeping quarters. The system has had to deal with eleven union grievances over the practice and complaints by crew men and women and their spouses to legislators, the governor and other state officials. Men have chosen to sleep in chairs in passenger areas in preference to berthing in the same quarters with women . . .

The ferry system then goes on to state: The ferry system is not threatening to do away with this troublesome mixed berthing; it will continue the practice in what may even be an *overzealous* effort to make employment of more women possible on the ferries. What is distressing to

the ferry system is that, having gone this extra step *beyond* what is required by the EEOC (R–89) and having ventured into a practice that can be criticized as *beyond* existing standards, it is now having to defend not taking this questionable step at an earlier date.

It appears that the ferry system may have created this problem in an overscrupulous effort to avoid discrimination in employment on the ferry system vessels by reason of sex. But whatever its reason for taking this step, it would seem that there might have been reasonable alternatives to requiring men and women to share the same sleeping quarters. For example, it was suggested at the time the motions for summary judgment were being considered by counsel and the court that the staterooms in the steward's department contain two berths each. As the plaintiffs suggested, it would be just as easy to put two women in a two-bed stateroom as two men. The ferry system argues, however, that at the time the women applied, the crew and crew quarters were full so that their only employment opportunities were as relief workers filling single vacancies as they came up. All full-time waiters and utility workers were males and they generally shared cabins with two berths. Consequently, if a woman relief worker replaced either a male utility worker or waiter, she would have to take the only vacant berth in a cabin with a male. In this tight system, the ferry system contends, there was no room for flexibility and adjustment.

The existence of this condition at the time plaintiffs applied for employment does not justify the discrimination practice against the plaintiffs. The arrangement the ferry system speaks of was one of its own making, by originally restricting the position of utility worker and waiter in the steward's department to males only, and thus doing exactly what the anti-discrimination statute proscribes. It would not seem unreasonable when an odd number of women are hired for a ferry to place all but one in a two-berth stateroom (not with males) and make some other temporary ac-

commodation for the remaining woman, such as sharing a room with a matron until the number of women employed came out to an even number. A little creative imagination on the part of the ferry system, which may necessitate some shifting of crew members among the different vessels of the ferry system, certainly would solve the "great problem" the ferry system contends it faces and which it created by its own actions.

All that we need say is that neither the berthing problems nor the other matters we have discussed are of sufficient import to justify the sex discrimination in employment that was practiced by the ferry system at the time the plaintiffs sought employment. The position of a utility person or waiter in the steward's department was not such as to reasonably demand that only males be hired. There was no urgent or overriding necessity that there be a distinction in such employment on the basis of sex.[6] Summary judgment in favor of the ferry system was improvidently granted.

The judgment is reversed. The case is remanded to superior court (a) for the entry of summary judgment in favor of plaintiffs, and (b) for the purpose of resolving issues raised in the plaintiffs' complaints, such as back pay, seniority status, etc.

Reversed and remanded.

---

6. The Federal Civil Rights Act prohibits discrimination in employment on account of religion (42 U.S.C. § 2000e–2), "Unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). In *Wondzell v. Alaska Wood Products, Inc.,* 583 P.2d 860, Opn.No. 1720 (Alaska, September 15, 1978), we held that because of the similarities between the Federal and Alaska Civil Rights Statutes, there should be read into the Alaska Statute (AS 18.80.220) the "reason-

able accommodation" exception in the federal law regarding religious beliefs.

However, in the case at hand, there is no necessity to rely upon federal decisional law to reach the result we have. The reason for this is that (1) we are not dealing with religion, which is not included within the "reasonable demands" exception in the Alaska Statute; and (2) the "reasonable demands" exception to the prohibition against discrimination on account of *sex* in the Alaska Statute is clear and unambiguous, and does not necessitate resort to federal decisional law for interpretation.