Genevieve THOMAS, et al., in their own behalf, and in behalf of others similarly situated, and Bonnie Hurst and Louise Mills, in their own behalf, Appellants,

v.

ANCHORAGE TELEPHONE UTILITY and International Brotherhood of Electrical Workers, Union Local 1547, Appellees.

No. S–51.

Supreme Court of Alaska.

July 28, 1987.

tions (45%) than for female-dominated positions (35%). The trial court held that defendants ATU and the International Brotherhood of Electric Workers, Local 1547 (IBEW) successfully rebutted the plaintiffs' prima facie case of disparate treatment sex discrimination; plaintiffs failed as a matter of law to establish a case of disparate impact sex discrimination; IBEW did not breach its duty of fair representation; ATU was entitled to partial attorney's fees, and IBEW was entitled to partial attorney's fees and costs. Our disposition of the case requires a remand for further proceedings.[1]

Paul L. Davis, Lee Holen, Boyko, Davis & Dennis, and Elizabeth I. Johnson, Anchorage, for appellants.

Thomas F. Klinkner, Asst. Mun. Atty., Jerry Wertzbaugher, Mun. Atty., Anchorage, for appellee Utility.

M. Gregory Oczkus, Anchorage, for appellee Union.

Allison E. Mendel, Jermain, Dunnagan & Owens, Anchorage, amicus curiae for Totem Ass'n of Educational Support Personnel.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

In this case we are called upon to determine the propriety of a negotiated salary increase for Anchorage Telephone Utility (ATU) employees in 1975 which featured a larger increase for male-dominated posi-

## I. FACTUAL AND PROCEDURAL BACKGROUND

This class action sex discrimination suit began in 1976 when Thomas et al. [Thomas] sued ATU for violation of AS 18.80.-220.[2] IBEW, the union representing Thomas, was made a defendant in 1977. The allegations of discrimination involved hiring and promotion practices, and a 1975 collective bargaining agreement (the 1975 Agreement) negotiated between IBEW and ATU.[3] Complaints regarding the 1975 Agreement covered a range of employment terms and conditions (including lunch provisions, shift differentials, starting pay levels and life insurance benefits), but the heart of the grievance was the disparity between the negotiated wage increase received by male-dominated groups and female-dominated groups. The hourly work force at ATU fell into three main categories: plant forces (300 employees—predominantly male); traffic forces (70 employees—predominantly female); commercial/clerical forces (25 employees—predominantly female). Plant forces received a 45% wage

---

1. For a commentator's pre-decision analysis of some of the issues presented in this case, *see Thomas v. Anchorage Telephone Utility: Alaska Tackles Gender-based Wage Discrimination,* IV Alaska L.Rev. 71 (1987).

2. AS 18.80.220(a)(1) provides that it is unlawful for

 an employer to refuse employment to a person, or to bar him from employment, or to discriminate against him in compensation or in a term, condition, or privilege of employ-

ment because of his race, religion, color or national origin, or because of his age, physical handicap, sex, marital status, changes in marital status, pregnancy or parenthood when the reasonable demands of the position do not require distinction on the basis of age, physical handicap, sex, marital status, changes in marital status, pregnancy or parenthood.

3. Thomas' claim does *not* involve equal pay for equal work or work of comparable worth.

increase over two years; traffic, commercial and clerical (TCC) forces received a 35% wage increase for the same period.

The trial court certified the class action in 1979. In November 1982 appellants and ATU entered into a consent decree settling class claims of discrimination in hiring and promotion and failure to grieve issues. A court trial was held on the claims surrounding the 1975 Agreement.[4] The superior court held that

1) Appellants established a prima facie case of disparate treatment, but ATU sufficiently rebutted the prima facie case by presenting valid business justifications for the terms of the 1975 Agreement;

2) IBEW did not breach its duty to represent the plaintiffs fairly in the negotiating process;

3) Appellants failed to establish a prima facie case under the disparate impact theory of employment discrimination;

4) ATU was entitled to $49,515.96 in fees and IBEW was entitled to $7,380.00 in fees and $4,007.71 in costs.

Thomas appeals.

## II. DISCUSSION

In interpreting this area of Alaska law, we have examined the parallel body of federal employment discrimination law embraced in 42 U.S.C. 2000e—2000e–17 (1982) (Title VII) and the accompanying federal cases for guidance. *E.g., Alaska State Commission for Human Rights v. Yellow Cab,* 611 P.2d 487, 490 (Alaska 1980). Federal courts have identified two major theories for proving employment discrimination under Title VII: disparate treatment and disparate impact.

**4.** The class claims were originally accompanied by individual claims. Some of the latter were dismissed before trial on statute of limitation grounds. Those dismissals were listed in the points on appeal. Appellants have failed to brief the claims dismissed on statute of limitations grounds. As a result, these issues are considered abandoned and require no examination on appeal. *Jeffries v. Glacier State Telephone Co.,* 604 P.2d 4, 7 n. 8 (Alaska 1979); *Sullivan v. Municipality of Anchorage,* 577 P.2d 1070, 1071 n. 1 (Alaska 1978).

## A. DISPARATE TREATMENT ANALYSIS.

The United States Supreme Court has explained that disparate treatment

is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396, 415 n. 15 (1977).

█ There are three main stages in a disparate treatment case. The first stage requires the employee to introduce evidence raising an inference of employer discriminatory intent. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973). If the employee can meet this initial burden he or she has established a prima facie case of disparate treatment which shifts the burden to the employer to rebut the prima facie case. It is important to note that a "wide variety of evidentiary patterns may suffice to establish a prima facie case; the primary inquiry is whether a claimant has demonstrated circumstances which, if otherwise unexplained by the employer, make it appear likely that impermissible factors played a role in the employer's decision." *Strand v. Petersburg Public Schools,* 659 P.2d 1218, 1222 n. 7 (Alaska 1983). There is no one test or formula that an employee must satisfy to make out a prima facie case.

Another individual claim (Marilyn Centoni's) was tried. The court held that Centoni failed to establish a prima facie case of discrimination. That decision was also listed as a point on appeal. Appellants argue in their reply brief that they preserved Centoni's claim when they stated in their opening brief that they appeal "from the dismissal of the individual claim of Marilyn Centoni which was part of the class contract claim." We will address Centoni's claim together with the class claim, since they are the same.

The second stage occurs after the employee establishes a prima facie case. At that point, the burden shifts to the employer who must "articulate some legitimate, nondiscriminatory reason for the [disparate treatment]." *Alaska USA Federal Credit Union v. Fridriksson*, 642 P.2d 804, 808 (Alaska 1982) (footnote omitted), *quoting McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678.

■ If the employer articulates legitimate business reasons for the disparate treatment, the burden shifts back to the employee for the final stage. At this point, the employee has the opportunity to prove that the employer's proffered reasons are pretextual. *Fridriksson*, 642 P.2d at 808. An employee has broad latitude in attempting to discharge the burden associated with the third stage. He or she may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207, 217 (1981).

■ The evolution of disparate treatment employment discrimination jurisprudence in Alaska has left some uncertainty regarding the precise burden an employer must bear when attempting to rebut an employee's prima facie case. Must the employer *prove* a legitimate business reason,[5] or *articulate* a legitimate business reason to overcome the prima facie case?[6] We recognize the need for a clear statement of the law to answer this question, as we are mindful that the difference between having

the burden of persuasion versus the burden of production can determine the outcome of litigation. We are persuaded by the federal approach, set forth in *Burdine*, where the Supreme Court explained:

the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.

*Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096, 67 L.Ed.2d at 218.[7]

Some courts have voiced reservations about giving employers only a burden of production. In *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251 (5th Cir.1977), the court stated its reasons for placing the burden of persuasion on the employer. The court was concerned that if an employer did not have to *prove* a legitimate, nondiscriminatory reason for an action, the employer could compose fictitious, but legitimate, reasons for the action. The employee would then have to attempt "to prove that a reason without factual foundation—presumed true—was a pretext for discrimination." *Id.* at 1255.[8] In *Burdine v. Texas Department of Community Affairs*, 608 F.2d 563, 567 (5th Cir.1979), *vacated*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the court justified its holding in *Turner* by saying it stated the obvious: " 'articulating' a legitimate reason involves more than merely stating fictitious reasons; *legally sufficient* proof is needed

---

5. *See* Fossey, *Employment Discrimination Law—Strand v. Petersburg Public School and Fridriksson v. Alaska USA Federal Credit Union: The Supreme Court Charts an Uncertain Course,* 1 Alaska L.Rev. 53, 63–71 (1984).

6. *See Employer Defenses in Employment Discrimination Litigation: A Reassessment of Burdens of Proof and Substantive Standards Following Texas Department of Community Affairs v. Burdine,* 55 Temp.L.Q. 372, 375–80 (1982).

7. Our decision in *Strand v. Petersburg Public Schools,* 659 P.2d 1218 (Alaska 1983) is not inconsistent with today's decision.

Examining the *Strand* opinion makes it plain that we focused not on burdens of proof, but on the substantiality of the evidence to support the Human Rights Commission's finding of discrimination. *Strand* did not answer the question confronted today.

8. *Turner* was later overruled by *Burdine v. Texas Dept. of Community Affairs,* 647 F.2d 513 (5th Cir.1981). We cite *Turner* to illustrate some courts' concerns about giving defendants only a burden of production.

before the trier of fact can find plaintiff's proof rebutted." *Id.* at 567 (emphasis in original).

In response, the United States Supreme Court enumerated three reasons why the Fifth Circuit's expressed concerns should not control the outcome of the case, and why limiting the employer's burden to a production of evidence would not "unduly hinder the plaintiff." *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096, 67 L.Ed.2d at 218. First, the burden of production calls for "clear and reasonably specific" explanations. *Id.* (citations omitted). "This obligation arises both from the necessity of rebutting the inference of discrimination arising from the prima facie case and from the requirement that the plaintiff be afforded 'a full and fair opportunity' to demonstrate pretext." *Id.* Second, the employer has an incentive, if not the legal obligation, to persuade the factfinder that the employment decision was lawful. *Id.* Third, the already liberal federal discovery rules are further enhanced by an employee's access to Equal Employment Opportunity Commission investigative files. *Id.*

We agree that concerns such as those expressed in *Turner* are unwarranted. We do not interpret *Burdine* as allowing an employer to compose fictitious, post-hoc justifications for an action taken against an employee. Rather, the employer must articulate legitimate business *reasons existing at the time* the employment decision was made and *supported by admissible evidence.* If the employer does so, the burden shifts back to the employee, who may attempt to prove that the proferred reasons are pretextual. *Fridriksson,* 642 P.2d at 808 n. 5.

■ In this case, the evidence supported findings that ATU and IBEW articulated legitimate reasons for their decision to give differential wage increases and produced admissible evidence supporting those reasons. That evidence would allow the trier of fact rationally to conclude that discriminatory animus was not the motivating factor in the employment decision. ATU and IBEW met their burden under the law as clarified today.

1. *Differential Wage Increase.*

a. ATU's Articulated Legitimate Business Reason: The Market Factors Defense.

■ The evidence supports the trial court's finding that "[d]efendants rebutted the prima facie case through evidence that the decision at issue derived from considerations of relevant market factors and the realities of the collective bargaining process." The inquiry thus becomes whether the trial court's finding that the reasons were credible is clearly erroneous. Alaska Rule of Civil Procedure 52(a) provides that "[f]indings of fact shall not be set aside unless clearly erroneous" when an action has been tried to a court without a jury. This court has explained the standard as follows: "A finding of fact is clearly erroneous only when this court is left with the firm and definite conviction on the entire record that a mistake has been made." *Stanton v. Fuchs,* 660 P.2d 1197, 1198 (Alaska 1983) (citations omitted).

The trial court determined in findings of fact # 39–44 that

—In the course of negotiating the 1975 contract, ATU management was influenced by a variety of factors. Among those factors was the tremendous growth that occurred in Anchorage in connection with the construction of the Trans-Alaska pipeline, and other petroleum and resource related developments. (# 39)

—At the same time that demand for telephone services in Anchorage increased dramatically, competition for the supply of persons qualified to provide such services likewise increased. (# 41)

—ATU felt the effects of this competition to an unusual degree for several reasons. First, the company responsible for construction of the pipeline communication system was based in Anchorage and could be expected to recruit actively in the Anchorage area. Second, some of the pipeline communication work required advanced telephone craft skills. ATU, because of its increasing service to

businesses who desired sophisticated private switchboard systems, had among its employees more personnel trained in these areas than most other utilities operating in the state. (# 43)

—Attempts by ATU to enlarge the pool of available craft employees in the state were generally unsuccessful. Specifically ATU management contacted over 200 journeymen who had completed instruction conducted by the manufacturer of much of the equipment utilized by ATU. In this communication ATU outlined the pay and benefits available to its employees. Only two of the 200 persons contacted responded. (# 44)

Thomas acknowledges the expansion of ATU services during the pipeline years but contends that there was no proof that: (1) ATU had reason to believe skilled workers would leave for the pipeline; (2) any workers did actually leave for the pipeline; (3) such concerns were a major factor in negotiations; (4) IBEW did not provide craft workers when ATU requested them.

Keeping in mind the clearly erroneous standard which governs this court's review of the trial court's findings of fact, the record as a whole contains support for the findings. There is evidence that the number of telephones in Anchorage exploded between 1970 (21,300) and 1978 (135,000). ATU had trouble meeting the burgeoning demand; residential and commercial installations were delayed and ATU had a generally poor community reputation as of 1974–1975. ATU attempted to improve its operations, but had trouble hiring technicians to come to Anchorage. Expert testimony established that the pipeline construction caused significant competition for certain types of skilled workers in Anchorage. At least one specific ATU effort to recruit skilled workers was a dismal failure. When the negotiations for the 1975 Agreement got underway, the ATU team knew of the increased demand for skilled plant workers. Further testimony established

that ATU had lost some technicians directly to pipeline work.

By comparison, ATU had little difficulty hiring TCC workers. ATU claims that part of the reason for this difference was the relatively short time required to train employees for these positions as opposed to the plant positions. For example, a commercial representative could be trained in four weeks, an operator in two months. In contrast, a journeyman in plant forces required four years of technical training in an apprenticeship program.

Thomas challenges the validity of this defense. Thomas argues that a "defendant should not be permitted to 'create' a market rate for a particular job, and then use that artificial market rate as a justification for lower wages for other employees." She makes the point in reference to a claim that the IBEW effectively controlled wages for all electrical workers in the state, and that IBEW's determination of a job's value should not be accepted as a true indication of value.

In this case, however, ATU does not invoke the defense to justify payment of different base wages, but rather to explain a differential percentage wage increase. It points to specific conditions existing at the time the increase was negotiated which necessitated a higher wage increase for plant workers.

Under these circumstances, we believe ATU's need to recruit trained plant workers, in the face of a burgeoning demand for phone services and stiff competition from other employers for skilled employees, constitutes a legitimate business reason for negotiating different wage increases. ATU thus met its burden.[9]

b. Thomas' Rebuttal.

 The trial court found that the "plaintiffs have failed to prove, that it is more likely than not, that defendants' explanations or justification for the provisions of the 1975 contract, specifically in-

---

9. ATU and IBEW also justified the higher wage increase for plant employees by claiming that they provided equal benefits to *all* employees. We do not address the benefits defense due to

our conclusion that market factors constitute a legitimate reason for negotiating differential wage increases.

cluding the wage terms, are 'pretextual' or unworthy of credence."

Thomas alleges that ATU could have attempted to break down each broad employment classification, *e.g.*, plant forces, and could have sought higher raises only for those particular groups, *e.g.*, the skilled crafts, for whom there was a special demand. She argues that special demand did not exist for every member of the plant forces, *e.g.*, warehousemen. Therefore, the raise awarded to all plant forces was arranged to benefit the men at the expense of the women.

We are not persuaded that the trial court was clearly erroneous in finding that Thomas failed to prove that ATU's market factors defense was merely a pretext for intentional discrimination.

2. *Terms and Conditions of Employment.*

In addition to attacking the wage increase, Thomas maintains that four terms and conditions of employment contained in the 1975 Agreement discriminated against women. First, she challenges lunch hour provisions which gave men more paid lunch time than women. Second, she claims that men received better pay terms for shift differentials. Third, she asserted that starting pay levels were different for men and women. Fourth, she objects to the provision of life insurance based on an employee's salary; this meant that "men in higher paying Plant jobs received more life insurance benefits than TCC women in lower paying jobs."

■ Regarding lunch pay provisions, the trial court found as follows:

Under the 1975 contract, certain divisions of plant forces received the right to a paid lunch. The employees receiving this benefit were construction and installation employees whose work required them to travel some distance from the central ATU offices. Under prior procedure, apparently because of certain apprehensions of the city relating to ... liability, these employees had been entitled to return to the central office on company time for lunch. In some cases,

this nonproductive travel time to and from the work site amounted to an hour or two hours a day. The 1975 contract provision for paid lunch was regarded by ATU management as an improvement over the prior situation, though not ideal. Other divisions, including the operators on certain shifts, likewise received paid meal times.

There is evidence in the record to support the finding that prior to 1975 installation workers—men—were permitted to drive to ATU's central facility from the worksite for lunch on company time. This resulted in lengthy, paid "lunch" periods. The allowance for 30 minutes of paid lunch at the worksite was the compromise reached in the 1975 Agreement to stop abuses associated with long drives to ATU headquarters. This is a legitimate business reason for the paid lunch these workers received.

Regarding shift differentials, the trial court found:

The 1975 contract provided for a 10% pay differential for plant employees in cases where those employees were required to work outside a regular shift. The employer retained control over the scheduling of shifts so that this differential was paid, if at all, only when extra shift labor was required on a temporary or emergency basis. Shift differentials were also provided for other classes of employees, notably operators. For operators, the differential was paid with respect to hours worked outside regular shift hours. Shifts for operators were scheduled on a 24–hour basis so that operators working nonstandard shifts received the 10% shift differential on a regular basis.

■ The shift differential gave plant forces 10% extra of the basic hourly wage for *all* hours worked outside, as well as inside, their regular shift. This contrasts with the shift differential available to traffic: 10% extra of the basic hourly wage only for those hours worked outside a regular day. Nothing in the record contradicts the trial court's findings that the "advantageous" shift differential was paid to

plant forces only on a temporary or emergency basis, while traffic received their "less advantageous" shift differential regularly. We agree that the distinction between "temporary" and "regular" availability of the varying shift differentials supports a legitimate business reason for the disparity.

■ Thomas and Marilyn Centoni argue that when experienced TCC employees [predominately female] left ATU and returned they were required to wait the entire probationary period before receiving the full wage rate,[10] despite the fact that initially they could be trained in a relatively short time. The plant employees [predominately male], however, started at the full wage rate whether or not they had previous experience at ATU.[11]

Regarding starting pay provisions, the trial court found:

The contract provided that employees in the traffic and commercial sections would be hired at a probationary level, reaching full pay after one year of service. The rationale stated by management for this arrangement was the need to familiarize those employees with the particular aspects of operations at ATU.

Fully qualified craft personnel began employment at the full beginning rate. Such personnel, for the most part, had undergone a four year apprenticeship program in their particular craft. During the apprenticeship period an employee was paid substantially less than the beginning craft wage, with increases as the employee approached the end of the apprenticeship period.

Within the commercial section the requirement of beginning at a probationary pay rate was applied evenly to male and female employees, specifically, Joe Loera and Marilyn Centoni.

The trial court and ATU misconstrued Thomas' argument. ATU argued that

plant employees had to undergo four years of low-pay training before hire, while TCC employees had training periods of up to several months after hire. The trial court found that men and women within TCC had to wait before earning top scale wages. Neither response addresses Thomas' claim. The issue here is not whether men and women within the same department had to wait different periods of time to receive full wages, nor is it that only TCC employees had to undergo a training period. Rather, Thomas claims that the plant employees who left and returned to ATU earned full contract wages upon their return, while returning TCC employees had to wait a year before earning full contract wages *despite* their previous experience at ATU.

In view of the trial court's misconstruction of Thomas' argument, and the resulting failure to address whether ATU has articulated a legitimate business reason for the disparate treatment of plant employees and TCC employees with regard to starting pay levels upon rehire, judgment against Thomas on this issue must be reversed and the case remanded for further proceedings. On remand the trial court may proceed on the evidence previously presented or take additional evidence.

■ Finally, the trial court noted that all benefits were provided equally to employees regardless of salary with one exception. "Only employee life insurance, as a matter of city-wide policy, was a function of annual salary." The record contains evidence that this is standard practice and eases administration of insurance benefits. Thomas makes the bold assertion that such a provision is discriminatory without offering any reasons or cases to support the contention. We conclude that the trial court correctly found that the insurance

**10.** Under the 1975 agreement, TCC employees must work through two lower step pay rates for a period of one year before receiving the full contract rate.

**11.** The trial court dismissed Marilyn Centoni's claim that women as a group were denied leaves of absence without pay while men were granted leaves of absence without pay. It did not specifically address Marilyn Centoni's claim as to the two step pay increases for rehired TCC employees.

plan is supported by legitimate business reasons.

## B. DISPARATE IMPACT ANALYSIS.

Thomas argues that the court erred in concluding as a matter of law that her claim could not be brought under a disparate impact theory.

Disparate impact differs from disparate treatment because it does not require a showing of intent. "[G]ood intent or absence of discriminatory intent does not redeem employment procedures ... that operate as 'built-in headwinds' for minority groups...." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971). Under a disparate impact theory, an employee can challenge a facially neutral employment act, practice or policy that has a significant discriminatory impact and is not justified by business necessity. *Id.; see also Teamsters*, 431 U.S. at 349, 97 S.Ct. at 1861, 52 L.Ed.2d at 423.

This is the first time we have addressed the application of disparate impact theory to a claim of discrimination under AS 18.-80.220. Therefore, we must determine the proper analytical framework for a disparate impact claim.

The United States Supreme Court has established a tripartite analysis for disparate impact claims. To present a prima facie case of discrimination, the employee must show that a facially neutral employment act, practice, or policy has a significant discriminatory impact on a protected group. *Teamsters*, 431 U.S. at 349, 97 S.Ct. at 1861, 52 L.Ed.2d at 423.[12] Once the employee has made this showing, the employer has the burden of proving that his or her actions are justified by a business necessity or job-relatedness. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280, 300–01 (1975); *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 165. The employer has the burden of persuasion on this issue.[13] If the employer establishes a business necessity or job-relatedness, then the employee has an opportunity to prove that other acts or practices could accomplish the employer's legitimate interest with a less discriminatory impact. *Albermarle Paper Co.*, 422 U.S. at 425, 95 S.Ct. at 2375, 45 L.Ed.2d at 301.

We adopt this analysis for claims of discrimination brought under a disparate impact theory.

The trial court held that Thomas failed as a matter of law to present a claim under a disparate impact theory for three reasons. After noting that this case does not fit within the "typical" disparate impact claim which often involves an employer's initial hire or promotional procedures, the

---

**12.** In establishing a prima facie case, employees can rely upon statistical evidence. *E.g., Griggs*, 401 U.S. at 430 n. 6, 91 S.Ct. at 853 n. 6, 28 L.Ed.2d at 163 n. 6; *Dothard v. Rawlinson*, 433 U.S. 321, 329–31, 97 S.Ct. 2720, 2726–28, 53 L.Ed.2d 786, 797–98 (1977). The employer can rebut employee's prima facie statistical case by introducing more probative statistical analysis, by demonstrating inaccuracies or deficiencies in employee's statistical evidence or by establishing that the disparity shown by employee's statistics is not significant. *See, e.g., Dothard*, 433 U.S. at 331, 97 S.Ct. at 2727, 53 L.Ed.2d at 798; *Bauer v. Bailar*, 647 F.2d 1037, 1043 (10th Cir. 1981).

**13.** A majority of federal courts hold that the burden of persuasion shifts to the employer when showing business necessity. *See, e.g., Wright v. Olin Corp.*, 697 F.2d 1172, 1190 (4th Cir.1982); *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1303 (9th Cir.1982), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984); *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007,

1015 (2d Cir.1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Ramirez v. Hofheinz*, 619 F.2d 442, 446 (5th Cir.1980). *But see N.A.A.C.P. v. Medical Center, Inc.*, 657 F.2d 1322, 1333–35 (3d Cir.1981) (en banc) (in disparate impact case, plaintiff carries burden of persuasion at all times).

There has been some confusion on this issue after *Burdine* in which the Supreme Court held that plaintiff carried the burden of persuasion at all times in a disparate treatment case. However, the Supreme Court explicitly noted in *Burdine* that "the factual issues, and therefore the character of the evidence presented, differ when plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes." 450 U.S. at 252 n. 5, 101 S.Ct. at 1093 n. 5, 67 L.Ed.2d at 215 n. 5. The Supreme Court has not explicitly or implicitly suggested that the *Burdine* allocation applies in disparate impact cases.

trial court concluded that Thomas was challenging the entire collective bargaining process, which the trial court believed to be too broad in scope to constitute a specific act, practice or policy under a disparate impact theory. It also concluded that the disparate impact theory was inappropriate since it has not been utilized in comparable worth discrimination actions.

We agree in part with the trial court's conclusions, but focus on a more basic flaw in Thomas' claim.

We agree with the trial court that this claim does not fit neatly within the "typical" disparate impact model since it does not involve hire, promotion or job classification practices. *See, e.g., Griggs*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (high school diploma and intelligence test requirements challenged); *Teamsters*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (seniority system challenged). But because a fact pattern fails to fall within the "typical" disparate impact paradigm does not alone compel the conclusion that it can never constitute disparate impact as a matter of law. We adopt the rationale of the Fourth Circuit, stated in *Wright v. Olin*, 697 F.2d 1172 (4th Cir. 1982), that "these theories [of disparate treatment and disparate impact] were not expected nor intended to operate with rigid precision with respect to the infinite variety of factual patterns that would emerge in Title VII litigation." *Id.* at 1184.

■ We believe that an expansive application of the disparate impact theory comports with the strong purposes behind AS 18.80.220.[14] As noted by the trial court, this court has repeatedly stated that "AS 18.80.220 is not only 'modeled on' the federal law, thus making federal case law relevant ... but is intended to be more broadly interpreted than federal law to further the goal of eradication of discrimination." *Wondzell v. Alaska Wood Products, Inc.*,

601 P.2d 584, 585 (Alaska 1979) (citations omitted), *cert. denied*, 444 U.S. 1040, 100 S.Ct. 724, 62 L.Ed.2d 726 (1980). In light of "the strong statement of purpose in enacting AS 18.80 and the legislature's intent "to put as many 'teeth' into the [statute] as possible," *McLean v. State*, 583 P.2d 867, 869 (Alaska 1978), *quoting Loomis Electronics Protection, Inc. v. Schaefer*, 549 P.2d 1341, 1343 (Alaska 1976), we cannot conclude that the disparate impact theory is limited to an employer's hire and promotion practices.

■ Thomas' disparate impact claim fails, however, not because it is atypical, but rather because her claim does not meet the tripartite analysis set forth for analyzing such claims. The trial court concluded that Thomas was challenging the entire collective bargaining process leading up to the 1975 contract under a disparate impact theory. We do not view her claim in this light. At the core of Thomas' claim is the disparity between the negotiated wage increase received by male-dominated groups and female-dominated groups. It is our view that this challenge, which Thomas claims is to a facially neutral employer act, practice or policy, in actuality presents a challenge to a nonfacially neutral employer act, practice or policy. As such, it does not meet the first prong of the tripartite test. ATU and IBEW's negotiated wage increase resulted in ATU overtly treating one group of people (the female-dominated group) less favorably than another group (the male-dominated group), thereby resulting in a discriminatory impact on the protected group. In our opinion, this is a quintessential disparate treatment claim requiring a showing of discriminatory intent on the part of the employer. Thomas' disparate impact claim fails because she is clearly challenging an employer act, practice or policy with not even a pretense of facial neutrality.[15]

14. AS 18.80.200(b) provides in pertinent part: [i]t is the policy of the state and the purpose of this chapter to eliminate and prevent discrimination in employment, ... because of race, religion, color, national origin, sex, age, marital status, changes in marital status, pregnancy or parenthood....

15. We do not here address whether a comparable worth theory may form the basis for a disparate impact claim under our statutes, since the parties specifically denied bringing this case under a comparable worth theory. The question of wage restructuring or job reclassification between the male and female-dominated groups is not at issue here.

In conclusion, we affirm the ruling of the trial court that Thomas did not present a claim under a disparate impact theory.

## C. IBEW DID NOT BREACH ITS DUTY OF FAIR REPRESENTATION.

This court has recognized that the resolution of issues arising under federal labor law is governed by such law. *See, e.g., Wondzell,* 601 P.2d 584; *International Brotherhood of Teamsters, Local 959 v. King,* 572 P.2d 1168 (Alaska 1977). Because IBEW falls under the purview of the National Labor Relations Act as the sole bargaining representative of ATU employees in 1975, federal law will determine the nature of IBEW's duty of fair representation and whether it breached that duty.

A labor organization need not satisfy fully every member it represents. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048, 1057–58 (1953). Differences in terms and conditions negotiated for different employees are not *per se* invalid. *Id.* at 338, 73 S.Ct. at 686, 97 L.Ed. at 1058. The bargaining unit crosses the line dividing appropriate and inappropriate conduct when it makes negotiating decisions affecting particular members which are arbitrary, discriminatory or in bad faith. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In other words, the duty of fair representation does not require that a union attain equality of benefits. *Toensing v. Brown,* 528 F.2d 69, 72 (9th Cir.1975). *See also Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 173 n. 12, 92 S.Ct. 383, 394 n. 12, 30 L.Ed.2d 341, 354 at n. 12 (1971). A bargaining unit must, however, give fair consideration to the views of minority members. *NLRB v. Local 315, International Brotherhood of Teamsters,* 545 F.2d 1173, 1175 (9th Cir.1976). The bargaining representative must have valid reasons for differentiating in its treatment of groups of employees, *see Kling v. NLRB,* 503 F.2d 1044, 1046 (9th Cir.1975), yet it also must be allowed a wide range of reasonableness to serve the unit it represents. *Ford Motor Co.,* 345 U.S. at 338, 73 S.Ct. at 686, 97 L.Ed. at 1058.

For IBEW to be liable for a breach of its duty of fair representation, Thomas must prove that its conduct was arbitrary, discriminatory or in bad faith. *See Vaca,* 386 U.S. at 193, 87 S.Ct. at 918, 17 L.Ed.2d at 859. Thomas alleged generally that IBEW denied her fair representation during contract negotiations because the final collective bargaining agreement established wages, working conditions, hiring practices and other provisions which discriminated on the basis of sex. "[A]llegations in a complaint alleging a breach of a union's duty of fair representation must contain more than conclusory statements alleging improper representation." *Williams v. General Foods Corp.,* 492 F.2d 399, 405 (7th Cir.1974), *quoting Lusk v. Eastern Products Corp.,* 427 F.2d 705, 708 (4th Cir.1970). The plaintiff must state supporting facts showing discriminatory conduct. *Williams,* 492 F.2d at 405. We agree that Thomas did not present facts that would support a finding that the union's conduct was arbitrary, discriminatory or in bad faith. Her general allegations were insufficient to meet the burden of proving that IBEW breached its duty of fair representation.[16]

## D. IBEW'S LIABILITY UNDER AS 18.80.220 FOR DISPARATE TREATMENT AND DISPARATE IMPACT.

AS 18.80.220, like Title VII, prohibits unlawful discrimination by unions

---

16. It may seem anomalous that ATU may have violated AS 18.80.220 with respect to the starting pay provision and yet IBEW did not breach its duty of fair representation. However, the results differ because the employee's burden of proof on a duty of fair representation claim differs from that in a disparate treatment claim. Thomas estabished a prima facie case under the *McDonnell Douglas* formula. ATU must now articulate a legitimate business reason. Under the duty of fair representation analysis, however, Thomas must prove that IBEW's actions exceeded the wide range of reasonableness within which a union can conduct negotiations. A plaintiff's initial burden to establish a prima facie case under disparate treatment is less than the burden of proving that a union breached its duty of fair representation.

as well as by employers. *See McDonald v. Santa Fe Transportation Co.*, 427 U.S. 273, 284–85, 96 S.Ct. 2574, 2581–82, 49 L.Ed.2d 493, 503 (1976). "A union's role as a joint participant in the negotiation of a collective bargaining agreement has been found sufficient to render it liable under Title VII where the contracted provisions were discriminatory in operation or perpetuated the effects of past discrimination." *Farmer v. ARA Services, Inc.*, 660 F.2d 1096, 1104 (6th Cir.1981) (citations omitted). Additionally, a union may be liable under Title VII for acquiescing in discriminatory noncontractual policies or conduct on the part of the employer. *See McDonald*, 427 U.S. at 285, 96 S.Ct. at 2581, 49 L.Ed.2d at 503; *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 989 (D.C.Cir.1973). The theories of disparate treatment and disparate impact, therefore, apply to Thomas' claims against IBEW. *See, e.g., Jackson v. Seaboard Coast Line Railroad Co.*, 678 F.2d 992, 1014 (11th Cir.1982); *Golden v. Local 55 of the International Association of Firefighters*, 633 F.2d 817, 820–21 (9th Cir.1980).

██ IBEW's defenses to the claims of discrimination mirror those of ATU. Under the disparate treatment analysis, IBEW has successfully rebutted Thomas' prima facie claims of discrimination based on differential wage increases, lunch hour provisions, shift differentials and life insurance benefits. *See supra* DISCUSSION II. Thomas failed to establish that IBEW's defenses were pretextual. However, Thomas makes the same argument against IBEW as against ATU—that the starting pay level provision for rehires is discriminatory in operation in that experienced TCC employees must retrain and wait a year before earning full contract wages when returning to ATU, while experienced plant employees earn full contract wages immediately upon return.

██ IBEW, like ATU, argued below that plant employees had to undergo a four year training period before hire while TCC employees had a much shorter training period on the job. IBEW also argued that the provision was a management requirement and established at ATU's request. Although the contract provision for starting pay may not be discriminatory, and may have indeed been implemented at ATU's request, it will nevertheless be incumbent upon IBEW to rebut Thomas' claim. IBEW's argument that the provision was instituted at ATU's request would not relieve it from liability since unions can be held liable for unlawful discrimination where the union acquiesces to a contract provision which is discriminatory in operation. *Farmer*, 660 F.2d at 1104.[17]

Therefore, we likewise remand Thomas' claim of intentional discrimination by IBEW with respect to the rehire starting pay level issues for appropriate disposition.

██ This case is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion. Based on our disposition of the appeal, we vacate the award of attorney's fees to ATU and attorney's fees and costs to IBEW.[18]

MATTHEWS, Justice, joined by BURKE, Justice, concurring.

## I.

An employer has no duty to offer equal benefits to groups of employees which do unequal work. At the same time, an employer may not offer unequal benefits to such groups because of the gender of the groups' members. The trial judge found that the unequal benefits at issue here were not gender motivated. Since these

17. It also may seem anomalous that IBEW may be liable for violating AS 18.80.220 and not have breached its duty of fair representation. The difference is in Thomas' burden of proof under disparate treatment as compared to a duty of fair representation claim. *See supra* note 15.

18. We do not address or indicate whether we would adopt the federal rule on attorney's fees.

The federal courts hold that attorney's fees may not be assessed against a losing plaintiff in a Title VII civil rights action unless the case is frivolous, unreasonable or groundless, or is brought or continued in bad faith. *See, e.g., Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648, 657 (1978).

findings were based on substantial credible evidence, they must be sustained. However, the trial judge did not, at least clearly, address one contention presented by the class plaintiffs. That contention is that ATU, because of discriminatory motives, refused to make an exception for former TCC employees who were rehired under its policy that all TCC employees start at a lower probationary pay scale. Thus, although it seems practically impossible that this omission will be held to be the result of discrimination in view of the trial court's findings on the numerous other theories which were presented, I agree to a remand for findings on this point.[1]

## II.

The majority concludes that this is not a disparate impact case because the different wage increases given to the different employee groups lack "even a pretense of facial neutrality."

The term "facial neutrality" as used in the disparate impact method of analysis merely means that the challenged practice or requirement is not imposed on the basis of a forbidden classification such as gender or race. The differential wage increase in the present case is facially neutral in the sense expressed. Of course, it is possible to say that the neutral veneer is easily penetrated since male dominated groups got a greater increase than female dominated groups. Still, the veneer of neutrality which exists in this case seems more substantial than that which was present in

the following cases where the disparate impact theory was applied. *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) (seniority lapses during maternity leave); *Wright v. Olin Corp.*, 697 F.2d 1172 (4th Cir.1982) (restricted access to jobs based on worker's potential for pregnancy); *Mitchell v. Board of Trustees of Pickens County School District A*, 599 F.2d 582 (4th Cir.) (mandatory non-renewal of contract for pregnancy), *cert. denied*, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979). The lesson of these cases is that whether an employment practice is facially neutral or facially biased is not critical to a proper application of the disparate impact theory.

In my view, the decision to grant different wage increases to different employee groups does not fit within the disparate impact theory. The theory only applies where a significant disparate impact on a protected class is caused by "specific, identified, employment practices or selection criteria." *Atonio v. Ward's Cove Packing Co.*, 810 F.2d 1477, 1485 (9th Cir.1987). Every case in which the Supreme Court has approved the application of disparate impact analysis has involved "an attack on a specific employment practice, such as a written scored test, or a specific objective requirement, such as a high school diploma requirement or a height and weight requirement." B. Schlei & P. Grossman, *Employment Discrimination Law* 1287 (2d ed. 1983) (footnotes omitted).

---

1. The trial court's findings concerning the claim of Marilyn Centoni can be read as making a remand even on this limited point unnecessary. Centoni, a TCC employee, was forced to quit her job in 1980 to travel with her husband to California so he could obtain medical treatment there. She returned to work with ATU in 1981, but had to start as a lower paid probationary employee. No credit was given for her three years of prior experience. Based on these facts, she presented two theories: (1) she was discriminated against because she was not granted a leave of absence, and (2) she was discriminated against because she should not have been required to start again on probationary status in light of her experience, even if she was properly denied a leave of absence. Thus, the leave of absence claim related to alleged discrimination upon leaving, while the probationary pay theory

related to discrimination upon returning. While focusing upon Centoni's leave of absence claim, the trial court made findings which were applicable to Centoni's claim of discrimination upon returning, namely: "Plaintiff failed to prove by competent evidence ... that women only were rehired on a temporary employee status after returning to ATU's employment.... [P]laintiff Centoni admitted, ... on cross-examination, that another male employee was, like her, required to resume his employment with ATU as a temporary employee." In view of the fact that Centoni's claim and the class claim relating to probationary status for returning, experienced TCC employees are identical, and in light of these findings, we may be carrying to a punctilio the requirement that findings address each contention presented.

In those jurisdictions where plaintiffs have raised claims similar to the one presented here, the courts have generally rejected the application of disparate treatment analysis. For example, in *American Federation of State, County, and Municipal Employees, AFL–CIO v. State of Washington*, 770 F.2d 1401 (9th Cir.1985) (AFSCME), the employer compensated employees in jobs where females predominate at lower rates than employees in jobs where males predominate. The trial court found a violation of Title VII under both the disparate treatment and the disparate impact theories of discrimination. The trial court's decision in *AFSCME* to apply disparate impact analysis received harsh criticism. *See generally* 1 A. Larson and L. Larson, *Employment Discrimination* § 33.22(c), at 7–139 (1984) ("More striking yet is the court's flagrant misuse of disparate impact theory as an alternate ground for liability"). The Ninth Circuit reversed because an employer's compensation decisions are not a "specific, clearly delineated employment practice applied at a single point in the job selection process," and such decisions involve "a number of complex factors" not readily evaluated under disparate impact analysis. 770 F.2d at 1405, 1406. *Accord Spaulding v. University of Washington*, 740 F.2d 686 (9th Cir.) (disparate impact analysis inappropriate to compare nursing school faculty salaries with other schools' faculty salaries), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984); *Christensen v. State of Iowa*, 563 F.2d 353, 356 (8th Cir.1977) (disparate impact analysis inappropriate to compare clerical workers' salaries with physical plant workers' salaries); *Lemons v. City and County of Denver*, 620 F.2d 228 (10th Cir.) (no cause of action under Title VII where plaintiffs seek to compare nurse positions with non-equal jobs), *cert. denied*, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980). I agree with the foregoing authorities and on this basis would affirm the decision of the superior court.

## III.

The term "prima facie case" has two common meanings. It may be used in the sense of a presumption where the burden of producing evidence is shifted to the defendant, who necessarily loses unless he produces the evidence called for. This is described in Evidence Rule 301(a):

> [A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast. The burden of going forward is satisfied by the introduction of evidence sufficient to permit reasonable minds to conclude that the presumed fact does not exist. If the party against whom a presumption operates fails to meet the burden of producing evidence, the presumed fact shall be deemed proved.... When the burden of producing evidence to meet a presumption is satisfied, the court must instruct the jury that it may, but is not required to, infer the existence of the presumed fact....

Alaska R.Evid. 301(a).

The second meaning of the term "prima facie case" is that it describes a state which is achieved when the plaintiff has presented enough evidence to avoid a directed verdict. In determining whether this state exists, the court is to view the evidence in the light most favorable to the plaintiff and draw all reasonable inferences in that party's favor. *Howarth v. Pfeifer*, 423 P.2d 680 (Alaska 1967). When a prima facie case, using the term in this sense, is made out, it is not correct to say that the burden of production shifts to the defendant. If the defendant merely rests he will not necessarily lose, for the court or the jury would then be required to weigh in a balanced fashion the facts and the evidentiary inferences to be drawn. Our Civil Rule 41(b) makes this clear. It provides that in an action tried by the court without a jury, where a motion to dismiss is made at the close of the plaintiff's case, "[t]he court as trier of the facts may then weigh the evidence, evaluate the credibility of witnesses, and render judgment against the plaintiff

*even if the plaintiff has made out a prima facia case."* Alaska R.Civ.P. 41(b) (emphasis added).

The trial judge in the present case seems to have used the term "prima facie case" in this second sense. The court stated that it was reaching its conclusion that a prima facie case of disparate treatment had been made out "when factual inferences are drawn in favor of plaintiffs." In a case such as this, involving a non-standardized fact pattern,[2] the trial court should only impose a burden of production on the defendant if it is prepared to say at the close of the plaintiff's case that upon a balanced weighing of the evidence and the inferences to be drawn therefrom, it would be prepared to rule in plaintiff's favor if no further evidence were produced.

Thus, while I agree with the discussion in the majority opinion concerning the consequences of making out a prima facie case in cases where there is a standardized fact pattern, as for example in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207, 217 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801–02, 93 S.Ct. 1817, 1823–24, 36 L.Ed.2d 668, 677 (1973); *Alaska USA Federal Credit Union v. Fridriksson,* 642 P.2d 804, 808 (Alaska 1982), and *Alaska State Commission for Human Rights v. Yellow Cab,* 611 P.2d 487, 490 (Alaska 1980), those consequences do not apply in cases where the trial judge has used the term prima facie case to mean merely that quantity of evidence which suffices to get the case to the jury.

---

**2.** A number of the more common standardized fact pattern presumptions are mentioned in C. McCormick, The Law of Evidence § 343, at 806–11 (2d ed. 1972).