**COOK SCHUHMANN & GROSECLOSE, INC., Appellant,**

v.

**BROWN & ROOT, INC., Appellee.**

No. S–10922.

Supreme Court of Alaska.

July 8, 2005.

---

Robert B. Groseclose, Jo A. Kuchle, and Peter M. LeBlanc, Cook Schuhmann & Groseclose, Inc., Fairbanks, for Appellant.

James D. DeWitt and Aisha Tinker Bray, Guess & Rudd P.C., Fairbanks, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION ON REHEARING*

EASTAUGH, Justice.

## I. INTRODUCTION

The beneficiary of a second deed of trust contends that a nonjudicial foreclosure sale on the first deed of trust was not fair and reasonable and violated the controlling statutes. The trustee halted the sale and postponed it for four hours to give two prospective bidders time to obtain cash or cashier's checks. Because this procedure was not unfair or unreasonable under the circumstances presented here, we affirm the summary judgment for Brown & Root, Inc., whose offset bid was the only bid received at the reconvened sale auction. We also affirm the Alaska Civil Rule 68 award of attorney's fees to Brown & Root. Its offer of judgment offering to reconduct the foreclosure sale was neither premature (even though it was made before

1. The company is also identified in the record as

the parties exchanged Alaska Civil Rule 26 disclosures) nor ambiguous.

## II. FACTS AND PROCEEDINGS

Michelle Lisper and Linda Jean Ross held two parcels of real property in Fairbanks subject to a first deed of trust issued February 7, 1994 in favor of Brown & Root. The deed of trust secured an obligation to make a payment of $200,000, plus interest, on or before April 1, 1998. Yukon Title Agency was named as trustee.[1] In 1995 Lisper and Ross granted a second deed of trust to appellant, Cook Schuhmann & Groseclose, Inc. ("Cook"), to secure an indebtedness of $25,000. Both deeds of trust provided for sale of the property upon default "to the highest and best bidder for cash in lawful money of the United States, payable at time of sale."

When Lisper and Ross failed to make the payments due on the first deed of trust, Brown & Root executed a Beneficiary's Declaration of Default and instructed Yukon Title to initiate foreclosure. The sale was noticed for January 14, 2002, but was continued at the beneficiary's request to March 28, 2002 at 10 a.m. The Notice of Default and Sale stated that the property would "be sold for cash or cashier's check to the highest bidder at public auction." The notice stated the sum owing on the obligation, but not the amount of the anticipated offset bid.

On March 28, 2002 Catherine Floerchinger, vice-president of Yukon Title, went to the Rabinowitz Courthouse to conduct the foreclosure sale. Cook's representative, Jo Kuchle, was among those present. Floerchinger asked if anyone planned to bid at the sale. Terry Stahlman indicated a desire to bid. Floerchinger took him aside and reviewed his funds to ascertain whether he had sufficient funds to exceed Brown & Root's anticipated offset bid of $302,957. Because Stahlman only had a cashier's check for $300,000, Floerchinger told him he was not qualified to bid at the sale.

Floerchinger began the foreclosure sale and entered the beneficiary's offset bid. When she asked if there were any other

"Yukon Title Company."

bidders, Cliff Everts attempted to bid $305,000. Floerchinger asked why he had not identified himself earlier; Everts responded that he was hard of hearing and had not heard her ask. Floerchinger took him aside to determine whether he had sufficient funds to bid. He had no cash or certified funds, but told Floerchinger that he could obtain the money from his banker.

Having determined that no qualified bidders, apart from the beneficiary, were present, but that two potential bidders might become qualified, Floerchinger decided to postpone the sale. She informed the group that the sale was postponed until 2 p.m. that day. Following Floerchinger's announcement, Stahlman told the group that he would have bid up to $350,000. Shortly thereafter Stahlman and Everts discussed whether they would attend the postponed sale. Stahlman told Everts that if Brown & Root obtained title to the property, it would strip off the junior liens, at which time one of them could purchase the property for less money.

At 2 p.m. Floerchinger returned to the courthouse to hold the sale. Stahlman and Everts were not present. Floerchinger submitted Brown & Root's offset bid. No one else bid, so Floerchinger sold the property to the beneficiary for the offset bid. Yukon Title issued a trustee's deed to Brown & Root on April 9, 2002.

Cook filed a superior court complaint against Brown & Root on May 21, 2002. It alleged that Brown & Root failed to conduct a commercially reasonable sale, violated AS 34.20.080(e), and tortiously interfered with Cook's second deed of trust. The complaint requested that the court place an equitable lien on the property, set aside the sale, enter a judgment against Brown & Root for the amount of Cook's junior lien ($25,000 plus statutory interest), enter a judgment against Brown & Root for all economic and noneconomic damages and for attorney's fees and costs, and provide such additional relief as the court deemed just and equitable.

Brown & Root served a Rule 68 offer of judgment on Cook on July 9, 2002. Among other things, the offer of judgment offered to re-conduct the foreclosure sale and to cover the expense of the notice and sale. On September 5, 2002 Brown & Root moved for summary judgment. The superior court granted the motion. Citing Rule 68(b)(1), Brown & Root then moved for an award of seventy-five percent of its attorney's fees. The superior court awarded fees in the amount Brown & Root requested. The court entered final judgment on January 23, 2003.

Cook appeals.

## III. DISCUSSION

### A. Whether the Nonjudicial Deed of Trust Foreclosure Sale Must Be Set Aside as Unfair or Unreasonable

#### 1. Standard of review

 A grant of summary judgment is reviewed de novo.[2] We review the facts presented in a light most favorable to the non-movant to determine whether any genuine issues of material fact exist and whether the movant is entitled to judgment as a matter of law.[3]

#### 2. Whether the nonjudicial deed of trust foreclosure sale was unfair or unreasonable

Cook argues that Brown & Root violated Alaska law in conducting a nonjudicial deed of trust foreclosure sale that was unfair and unreasonable. It reasons that the notice of sale was deficient because it failed to reveal the amount of the anticipated offset bid. It also argues that the notice was deficient because it failed to warn potential bidders that the trustee would regard any bidder without enough cash or a large enough cashier's check to match the trustee's bid as unqualified to bid on the property. Finally, it asserts that the trustee violated Alaska law by postponing the sale after it had started.

 We have stated our reluctance to set aside foreclosure sales except in the most

---

**2.** *Crosby v. Hummell,* 63 P.3d 1022, 1027 (Alaska 2003).

**3.** *Id.*

unusual circumstances.[4] Even when the sale fails to comply with the statutory provisions, we will set it aside only in cases that reach "unjust extremes."[5]

■ The statutory conditions were met here. Alaska law does not require the trustee to give prospective bidders notice of the amount of the anticipated offset bid or inform them that the trustee may require them to demonstrate their ability to pay their bids in cash or cashier's checks at the time of sale. Alaska law only requires that the trustee record a notice of default that specifies the name of the trustor, the book and page where the trust deed is recorded, a description of the trust property, a statement that a breach of the obligation for which the deed of trust is security has occurred, the nature of the breach, the sum of the obligation, the election by the trustee to sell the property, and the date, time, and place of the sale.[6] The statute requires notice of the amount of the obligation; it does not require notice of the amount of the anticipated offset bid.[7] Nor does it require notice that the trustee may require bidders to demonstrate their ability to satisfy the sale terms.[8] Cook conceded at oral argument on appeal that nothing in the statute precluded the procedure followed here.

No Alaska statutes or cases specify a procedure by which the trustee must conduct a foreclosure sale. Alaska Statute 34.20.080 only requires that the procedure comply with the terms and conditions of the deed of trust. Here the deed of trust required the buyer to pay cash at the time of sale. It stated: "Trustee … shall sell said property … at public auction, to the highest and best bidder for cash in lawful money of the United States, payable at time of sale." Per the deed of trust, the trustee was to provide written notice of the default and the sale. The notice of default announced that the property would be "sold for cash or cashier's check to the highest bidder at public auction."

■ We next consider whether the procedure followed here inherently rendered the sale unfair and unreasonable, requiring that we set it aside. Potential bidders with advance notice of the amount of the beneficiary's proposed offset bid might well be better able to bid successfully at the auction. But we are not convinced that the failure of a notice to state the amount of the anticipated offset bid prevents potential bidders from either independently calculating that amount or asking the trustee how to calculate it.

We also agree that giving advance notice that the trustee will require cash or a cash equivalent at the auction would potentially benefit those who, like Cook, hold junior

---

4. *McHugh v. Church*, 583 P.2d 210, 216 (Alaska 1978).

5. *Rosenberg v. Smidt*, 727 P.2d 778, 783 (Alaska 1986); *see also McHugh*, 583 P.2d at 216; *Semlek v. Nat'l Bank of Alaska*, 458 P.2d 1003, 1006 (Alaska 1969).

6. AS 34.20.070(b) states:

Not less than 30 days after the default and not less than three months before the sale the trustee shall record in the office of the recorder of the recording district in which the trust property is located a notice of default setting out (1) the name of the trustor, (2) the book and page where the trust deed is recorded, (3) a description of the trust property, including the property's street address if there is a street address for the property, (4) a statement that a breach of the obligation for which the deed of trust is security has occurred, (5) the nature of the breach, (6) the sum owing on the obligation, (7) the election by the trustee to sell the property to satisfy the obligation, and (8) the date, time, and place of the sale. An inaccuracy in the street address may not be used to set aside a sale if the legal description is correct. At any time before the sale, if the default has arisen by failure to make payments required by the trust deed, the default may be cured by payment of the sum in default other than the principal which would not then be due if no default had occurred, plus attorney fees or court costs actually incurred by the trustee due to the default. If under the same trust deed notice of default under this subsection has been recorded two or more times previously and the default has been cured under this subsection, the trustee may elect to refuse payment and continue the sale.

7. *Id.* The amount of the offset bid is the sum owing on the obligation as of the time of publication of notice, plus interest, costs, and expenses, including reasonable attorney's fees, incurred by the beneficiary until the time of sale.

8. *Id.*

deeds of trust.[9] Holders of junior deeds of trust would also potentially benefit from a procedure that would allow at least some appropriate grace period between receipt of the high bid and payment of the required cash or cashier's check.

But it is not necessary to decide in this case whether a notice that fails to inform bidders that the trustee will require immediate payment in cash or a cash equivalent necessarily renders the foreclosure sale unfair and unreasonable. Nor is it necessary to decide whether a foreclosure sale becomes unfair and unreasonable if the trustee declines to give the apparent high bidder a brief grace period in which to secure the required cash or cashier's check. We do not have to decide those questions because the postponement (the third procedural deficiency alleged by Cook) actually remedied any other possible procedural deficiencies. Neither AS 34.20.070 nor the deed of trust precluded the trustee from postponing the sale when it appeared that both prospective bidders other than the beneficiary had insufficient cash (or its equivalent) to consummate a sale at the scheduled time. The deed of trust gave the trustee authority to postpone the sale. By giving two prospective bidders actual knowledge of the amount of the offset bid and the need for cash or its equivalent, postponement provided some of the advance notice Cook advocates.

Also, neither Stahlman nor Everts was prepared to pay in cash or by cashier's check at the close of the 10 a.m. sale. Postponement therefore gave them an opportunity to cure their inability to consummate a sale if one of them was the high bidder; postponement potentially allowed them to submit qualifying bids. As it turned out, they apparently conferred, chose not to bid against each other, and elected not to return when the trustee reconvened the auction at 2 p.m. But Cook has directed us to no evidence that Brown & Root or the trustee procured their

absence or colluded with them, or otherwise behaved in a way that was intended to disfavor Cook. The postponement potentially benefited Cook. Had the sale taken place at 10 a.m., the only qualifying bid would have been Brown & Root's offset bid; a sale that morning as scheduled would have therefore inevitably erased Cook's second deed of trust.

Brown & Root also argues that Cook failed to preserve any objection to the procedure or postponement. Given our ruling on the merits of these issues, we do not need to consider whether Cook waived or preserved the issue.

**B. Whether Brown & Root Made a Valid Offer of Judgment by Offering To Reconduct the Foreclosure Sale**

**1. Standard of review**

The interpretation of Rule 68 "is a question of law that [this court] review[s] de novo, adopting the rule of law that is 'most persuasive in light of precedent, policy and reason.'"[10] We review awards of costs and attorney's fees for abuse of discretion, "which exists if an award is arbitrary, capricious, manifestly unreasonable, or improperly motivated."[11]

**2. Validity of the offer**

Cook challenges the superior court's award of Rule 68 attorney's fees to Brown & Root. Rule 68 provides in part:

> (b) If the judgment finally rendered by the court is at least 5 percent less favorable to the offeree than the offer ... the offeree ... shall pay all costs as allowed under the Civil Rules and shall pay reasonable actual attorney fees incurred by the offeror from the date the offer was made as follows:
>
> > (1) if the offer was served no later than 60 days after both parties made the disclosures required by Civil Rule 26,

---

9. The parties dispute whether the deed of trust and notice of default provided such notice. Cook argues that the term "time of sale" did not necessarily refer to the auction. We do not read the deed of trust and the notice to encourage prospective bidders to think that they would not be required to pay cash at the auction.

10. *Mackie v. Chizmar*, 965 P.2d 1202, 1204 (Alaska 1998) (quoting *Jaso v. McCarthy*, 923 P.2d 795, 801 (Alaska 1996)).

11. *Kellis v. Crites*, 20 P.3d 1112, 1113 (Alaska 2001).

the offeree shall pay 75 percent of the offeror's reasonable actual attorney fees. On January 3, 2003 the superior court awarded Brown & Root seventy-five percent of its attorney's fees, in accordance with Rule 68(b)(1). Cook challenges the award on several grounds.

█ Cook first argues that the offer was untimely because it was made before the parties exchanged Alaska Civil Rule 26 disclosures. Cook reads Rule 68 to apply only to offers made after Rule 26 disclosures are exchanged because, it reasons, this ensures that the parties possess sufficient information to evaluate the offer. Brown & Root argues that its offer, which was served before Rule 26 disclosures were due, was not premature under Rule 68(b)(1).

█ Because Rule 68 does not preclude pre-disclosure offers of judgment, the offer of judgment here was timely. Rule 68 has the purpose of encouraging settlements and avoiding protracted litigation.[12] If an offer is served no later than sixty days after Rule 26 disclosures are made, the offeror recovers seventy-five percent of its attorney fees.[13] If the offer is served after the sixty-day deadline but more than ninety days before trial, the offeror recovers fifty percent of its attorney fees; it recovers thirty percent if the offer is served ninety days or less but more than ten days before trial.[14] The rule therefore penalizes parties for delay. But it does not say when in a civil action a party may *first* make an offer of judgment. Rather, it states only when a party may *last* make an offer of judgment: either party may make an offer *"[a]t any time* more than 10 days before the trial begins."[15] Because Brown &

Root made its offer before the sixty-day deadline contemplated by subpart (b)(1), its offer was timely for purposes of awarding fees at the enhanced rate.[16]

█ Cook filed a petition for rehearing after we issued our original opinion of June 18, 2004. Cook's petition argued for the first time that the history of the legislation which amended AS 09.30.065 and which was the basis for our 1997 amendment of Rule 68 supports Cook's view that Rule 68(b)(1) does not apply to offers of judgment made before Rule 26 disclosures are exchanged.[17] We asked Brown & Root to respond to the petition.

Cook's petition argued that comments of Representative Porter, the bill's sponsor, support its interpretation of the meaning of the proposed amendment. On February 21, 1997, Representative Porter made these comments before the House Judiciary Committee:

> [O]ffers of judgment are, after a case has been filed, one party or the other can make a formal offer to settle the case. And what we're trying to do is to inspire reasonable offers and reasonable assessment of those offers and taking them if they are reasonable, consequently eliminating the costs of the process up to and including the trial, which is a cost to both parties and the state and everybody else.
>
> . . . .
>
> If that offer was made real early, then it would be real expensive to you if that happened, and a little bit less if it was made later and a little bit less if it was made later.
>
> . . . .

12. *Fernandes v. Portwine,* 56 P.3d 1, 8 (Alaska 2002).

13. Alaska R. Civ. P. 68(b)(1).

14. Alaska R. Civ. P. 68(b)(2)-(3).

15. Alaska R. Civ. P. 68(a) (emphasis added).

16. *See Farr v. Stepp,* 788 P.2d 35, 37 (Alaska 1990) (holding that Rule 68 does not preclude making offer of judgment while motion to amend pleading is pending).

17. Because Cook advances this legislative history argument for the first time in its petition for

rehearing, Appellate Rule 506(a) would normally call for its rejection as a basis for rehearing. *Watts v. Seward Sch. Bd.,* 423 P.2d 678, 679 (Alaska 1967) (interpreting Supreme Court Rule 35, predecessor to current Appellate Rule 506(a)). But we choose to consider the argument because the Rule 68(b)(1) prematurity issue may recur. Further, the issue does not require us to consider disputed facts, and presents only a question of law which can be resolved by consideration of the words of the underlying statute, its legislative history, and the text of the corresponding Civil Rule.

Consequently, what we're saying is that if this offer is made within a short period of time, from the ability that you would have after a case is filed to get discovery, so you kind of know where you're at, if a short period of time after that the offer is made, 60 days after that, and you don't accept it, and when you finally go to trial, the offer is within 5 percent of—less than what you would have settled for, you've got to pay all reasonable actual attorney's fees and costs, from the time the offer was made until the judgment was entered. This is an inducement.

. . . .

If the offer is made later than that 60 days after discovery, it goes down to 75 percent. If made just really a short time, 30 days before trial or something, then it goes down to 50 percent. Obviously, it is intended to make people, as early on as possible, assess their positions and make reasonable offers and have them accepted.

Representative Porter's comments seem to reflect an assumption that a knowledgeable offer could be made after the disclosures required by Civil Rule 26(a). But his words do not expressly suggest that he intended that any earlier offer would be premature and therefore invalid, the issue that is now before us. The text of the rule, the identical text of the underlying statute, and Representative Porter's comments do not convince us that offers made before the parties have made their initial disclosures are premature, and therefore ineffective. Such an interpretation, moreover, would mean that no offer could be effective under either AS 09.30.065(a)(1) or (2) (and thus, under Rule 68(b)(1) or (2)) unless both parties had made the disclosures required by the civil rules. This would mean that a party failing to make the required disclosure could purposefully or unintentionally interfere with the offer process. Further, such an interpretation would conflict with the first sentence of Rule 68(a),

which permits offers to be made "[a]t any time more than 10 days before the trial begins."

Consequently, we hold on rehearing that the offer was not premature and that it was not invalid even though it was made before the parties made Rule 26 disclosures.[18]

▌ Cook next contends that the offer was ambiguous. Cook argues, among other things, that the offer was invalid because it failed to state a definite sum. We conclude that the offer was valid. It unambiguously described exactly what relief Brown & Root would provide if the offer were accepted. Although we held in *Farr v. Stepp* that "[a]n offer of judgment must specify a definite sum and must be unconditional," our real concern in that case related to the specificity of the offer rather than its communication of a monetary amount.[19] Rule 68 permits offers that allow judgment for the "money or property or *to the effect* specified in the offer."[20] Nonmonetary offers of judgment are valid under the rule so long as they are unambiguous and unconditional.

We recognize that this result could potentially raise at least one additional question with respect to attorney's fees awards: how are courts to quantify a nonmonetary offer in determining whether it was five percent more favorable than the judgment? We need not address that issue here, however, because it was not squarely raised by Cook on appeal. Moreover, we think there is no question that the judgment for Brown & Root was far less favorable to Cook than the offer of judgment.

## IV. CONCLUSION

For these reasons we AFFIRM the judgment below.

BRYNER, Chief Justice, dissenting in part.

I disagree with the court's conclusion that Brown & Root's offer of judgment exposed

---

**18.** The court nonetheless asks the Standing Committee on Civil Rules to consider whether Civil Rule 68(b) should be amended to clarify the offer of judgment procedure, to consider whether it is appropriate to preclude enhanced fee awards as to successful offers of judgment made before the parties have made their Rule 26(a) disclosures, and to consider the application of Rule 68 to cases, such as small claims cases, in which no Rule 26(a) disclosures are required.

**19.** *Farr v. Stepp*, 788 P.2d 35, 37 (Alaska 1990).

**20.** Alaska R. Civ. P. 68(a) (emphasis added).

Cook to an enhanced award of fees under Civil Rule 68(b).

Civil Rule 68(b) strives to encourage prudent efforts toward early settlements by defining three time frames in which refusing an offer of judgment will be deemed unreasonable and can trigger penalties. The first time frame, set out in paragraph (b)(1), is at issue here:

> (b) If the judgment finally rendered by the court is at least 5 percent less favorable to the offeree than the offer, or, if there are multiple defendants, at least 10 percent less favorable to the offeree than the offer, the offeree, whether the party making the claim or defending against the claim, shall pay all costs as allowed under the Civil Rules and shall pay reasonable actual attorney fees incurred by the offeror from the date the offer was made as follows:

> (1) if the offer was served no later than 60 days after both parties made the disclosures required by Civil Rule 26, the offeree shall pay 75 percent of the offeror's reasonable actual attorney fees[.] [1]

Rejecting an offer during this time frame can result in requiring the offeree to pay seventy-five percent of the offeror's ultimate fees. But the wording of paragraph (b)(1) is ambiguous because it leaves the exact period encompassed within this provision unclear.

At least two readings are plausible. First, the provision can reasonably be read to define a period that begins upon the filing of initial disclosures—"after both parties made the disclosures"—and that ends no more than sixty days later—"no later than 60 days after." Alternatively, the provision might be read as describing a period with no real beginning—in other words, as allowing offers under paragraph (b)(1) to be served as early as the parties please, but "no later than 60 days after" their initial disclosures. Today's opinion chooses the latter meaning; but in

doing so, it ignores the provision's history, as well as its purpose, and offers no sound reason to support this choice.

The opinion begins by recognizing yet disregarding strong legislative history that favors the first meaning. On February 21, 1997, House Bill (H.B.) 58's sponsor, Representative Brian Porter, described to the House Judiciary Committee how Rule 68(b)(1) was intended to work. Representative Porter said that the provision would allow attorney's fees to be awarded only when offers of judgment are made after the parties "get discovery":

> Consequently, what we're saying is that *if this offer is made within a short period of time, from the ability that you would have after a case is filed to get discovery,* so you kind of know where you're at, if a short period of time after that the offer is made, 60 days after that, and you don't accept it, and when you finally go to trial, the offer is within 5 percent of—less than what you would have settled for, you've got to pay all reasonable actual attorneys' fees and costs, from the time the offer was made until the judgment was entered. [2]

Addressing the same committee again three days later, Representative Porter cemented this point:

> [T]he provision in the offer of judgment *is aimed right after discovery has been accomplished so that a person has a feel for how the case is,* one way or the other. The offer of judgments section comes into play and will certainly induce early settlement. [3]

The opinion dismisses these statements of legislative intent, observing that "Representative Porter's comments do not convince us that offers made before the parties have made their initial disclosures are premature." [4] This observation misses the point.

1. Alaska R. Civ. P. 68(b).

2. H. Jud. Comm. notes, 20th Leg., 1st Sess. (Feb. 21, 1997) (emphasis added).

3. H. Jud. Comm. notes, 20th Leg., 1st Sess. (Feb. 24, 1997) (emphasis added). The same intent was echoed by the bill's sponsor in its senate

version, Senator Robin Taylor, who described it to the Senate Judiciary Committee as requiring "the party who fails to accept an offer of judgment, *after a certain date,* to pay actual attorney's fees...." S. Jud. Comm. notes, 20th Leg., 1st Sess. (Mar. 12, 1997) (emphasis added).

4. Op. at 599.

Alaska's sliding-scale approach to statutory interpretation does not require a definitive statement before legislative history can be used as an aid in construing ambiguous language. And reliable expressions of legislative intent should not be ignored when they are useful aids in determining what ambiguous language means. Here, Representative Porter's description of H.B. 58's intended meaning seems particularly useful because it comports with his description of the bill's basic purpose: to encourage early settlement by penalizing unwise decisions made after a party has been fully informed—or as Representative Porter put it, after the party "has a feel for how the case is."

Although it rejects this meaning, today's opinion advances no sound reason for concluding that a party's *uninformed* decision to decline an early offer of judgment should presumptively be deemed unreasonable, and therefore penalized, when the uninformed guess turns out to be wrong. The opinion's interpretation of Rule 68(b) seems to run counter to the rule's goal of encouraging reasonable action. A rule that pushes parties toward uninformed choice encourages unreasonable action and simply invites abuse.

In defense of its interpretation, the opinion points to two problems that, in the court's view, weigh against the interpretation favored by legislative history and policy. First, the opinion reasons, if Rule 68(b)(1) were construed literally to require that "both parties" make their original disclosures before penalties could attach for rejecting an offer, then the purposes of the rule could be subverted, because "a party failing to make the required disclosure could purposefully or unintentionally interfere with the offer process" by failing to make an initial disclosure.[5]

But this reasoning describes a problem that will never arise. A party facing an offer of judgment from an opponent that has made a timely disclosure could never assert its own breach of the deadline as an excuse for rejecting the offer, since the offeree's failure to disclose would never impair its ability to make an informed decision. Civil Rule 94 allows flexibility to depart from the strict terms of a rule in the interest of justice. In this situation, a non-complying offeree could hardly claim that the interest of justice would be advanced by allowing its own breach to prevent Rule 68(b) from applying.

Second, the opinion reasons, Rule 68(a) militates against Representative Porter's interpretation of Rule 68(b) because "such an interpretation would conflict with the first sentence of Rule 68(a), which permits offers to be made '[a]t any time more than 10 days before the trial begins.'"[6] But this argument overlooks the two distinct purposes served by subsections 68(a) and 68(b).

In contrast to subsection 68(b), which penalizes unreasonable responses to offers of judgment, subsection 68(a), simply defines the basic framework for a valid and binding offer of judgment: it allows either party to make an offer "at any time," requires the offer to remain open ten days, specifies what the opposing party needs to do to accept it, and describes how to convert the accepted offer into a judgment.[7] Nothing in this subsection implies that any penalty necessarily will, or routinely should, flow from rejecting an offer; it merely adopts a uniform, enforceable, and generally applicable early settlement process—a framework that is useful and necessary regardless of whether penalties are imposed for unreasonably rejecting offers of judgment. Hence no conflict exists

5. Op. at 599.

6. Op. at 599.

7. Civil Rule 68(a) provides:

At any time more than 10 days before the trial begins, either the party making a claim or the party defending against a claim may serve upon the adverse party an offer to allow judgment to be entered in complete satisfaction of the claim for the money or property or to the effect specified in the offer, with costs then accrued. The offer may not be revoked in the 10 day period following service of the offer. If within 10 days after service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service, and the clerk shall enter judgment. An offer not accepted within 10 days is considered withdrawn, and evidence of the offer is not admissible except in a proceeding to determine costs. The fact that an offer is made but not accepted does not preclude a subsequent offer.

between subsections 68(a) and (b): the fact that subsection 68(b) prescribes sanctions for a limited universe of unreasonably rejected offers has no bearing on the validity or utility of subsection 68(a)'s procedures enabling parties to make and accept offers "at any time."

In keeping with H.B. 58's intended meaning and purpose, then, I would interpret subsection 68(b)(1)'s provisions as triggering penalties only after both parties have made their initial disclosures (or after the deadline for initial disclosures has expired). As to all other issues, I join in the court's opinion.