Lori A. ELLISON, Appellant,

v.

PLUMBERS AND STEAM FITTERS UNION LOCAL 375; Kirk Jackson; James Ballam; and John Doe No. 1, Appellees.

No. S–10849.

Supreme Court of Alaska.

Aug. 19, 2005.

---

Michael W. Flanigan, Walther & Flanigan, Anchorage, Christian N. Bataille, Law Offices of Christian N. Bataille, Fairbanks, for Appellant.

Lance Parrish, Parrish Law Office, APC, William B. Schendel, Winfree Law Office, APC, Fairbanks, for Appellee Plumbers and Steam Fitters Union Local 375. Aimee Anderson Oravec, Daniel E. Winfree, Winfree Law Office, APC, Fairbanks, for Appellees Kirk Jackson and James Ballam.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

Lori Ellison sued her former union, Local 375, and the union's stewards at her former work site, Kirk Jackson and James Ballam, for sexual harassment and aiding and abetting discrimination under AS 18.80.220 and 18.80.260. The superior court ruled against her on these claims, and granted attorney's fees to the union and stewards under both Civil Rules 68 and 82. Ellison appeals. Because the union has no duty to investigate sexual harassment on the part of the employer sua sponte and because Ellison has not shown that she asked the union to file a grievance or take other action, we affirm the judgment. However, we reverse the superior court's award of Rule 82 fees because we conclude that Rule 68 prohibits receiving fees under both rules.

## II. FACTS AND PROCEEDINGS

Lori Ellison was a pipefitter dispatched to work in the fabrication shop for H.C. Price on the Healy Clean Coal Project ("HCCP") in April 1996. Ellison, apparently the only female pipefitter in the fabrication shop, was subjected to a number of incidents that she perceived to be based on her gender during the course of her employment.[1] These included her male co-workers' complaints that Ellison was getting preferential treatment because she was initially assigned to do paperwork, as well as threatening and vulgar graffiti on welding screens, her work area and in the men's outhouse. In addition, someone posted an altered picture of her from the company newsletter with sexual profanity, and created a display of a tampon and "cramp pills" that indicated "in case of a cranky mood, break the glass."

Ellison reported five incidents to the stewards, who were on the job site but only occasionally in the fabrication shop where Ellison worked. James Ballam was the union steward until he left in about mid-March

1997, after which Kirk Jackson became the steward.

First, Ellison reported a co-worker's "spreading lies" in the spring or summer of 1996; Ballam addressed this issue, apparently to Ellison's satisfaction. Second, she reported the fabrication shop foreman Doug Gyuriscko's denial of her request to leave early in October 1996; Ellison was still not permitted to leave early, despite complaining to Ballam and Price supervisors. Third, she told Ballam and Price supervisors that her safety glasses were deliberately scratched and gouged in late January 1997. She was provided with new safety glasses. Apparently no one investigated, although Ballam may have discussed the incident with her co-workers. In addition to Ellison's three reports, Ballam was aware of the men's preferential treatment complaints.

The fourth incident was reported to steward Jackson in April 1997. Ellison told Jackson and the assistant general foreman about a co-worker calling her "bitch" during a dispute. The assistant general foreman, who was a union member, indicated to Ellison that he wanted to keep the issue "in house," which Ellison interpreted as meaning within the union. Ellison agreed to accept an apology from the co-worker and continue working with him, although the fabrication shop crew openly supported her co-worker. Lastly, Ellison showed Jackson and Gyuriscko threatening graffiti on her welding screen and desk in early May 1997. Gyuriscko said he would alert Price management, although other Price supervisors, at least one of whom was a union member, apparently wanted to handle the matter within the union.

Jackson also heard about many of the other incidents during two meetings held with Price management in May 1997. Ellison gave notice she was quitting at the first meeting and all those present, including Jackson, urged her not to leave. At the end of the meeting, Jackson "reasonably believed" Price officials were going to handle

---

1. The superior court found that a number of the specific incidents were either not gender-based or not directed at Ellison, concluding that "the unfortunate harassment to which Ellison was subjected and which was known to the stewards was not directed at her because she was a woman. It was based on personal reasons, personali-

ty conflicts, and on Ellison's conduct at work and in camp." Although Ellison contests these findings, we do not decide the issue because even if the union knew that Ellison was subjected to sexual harassment, she has not stated a claim for union liability.

Ellison's complaints. At the second meeting, Ellison still believed she should quit, although Price's general superintendent at HCCP advised her that Price had taken steps to educate people, cleaned up the graffiti, and would not allow her to be harassed.

The only other union officials who may have known of any of the incidents were business agent Jim Laiti and union manager J.C. Wingfield. In April 1997 Ellison was denied permission to leave a half-day early for her R & R period. Ellison believed she was being discriminated against because of her gender since two men had previously been allowed to leave early for their R & R periods. Ellison sought relief from Price supervisors, who contacted Laiti at the union hall. They decided that Ellison could leave at 3 p.m., rather than her requested time of noon.

Twice during her employment at HCCP, Ellison indicated to union officials, Laiti and Wingfield, that she was considering quitting or she made a request for information about other job opportunities. She never asked the stewards or any other union officials to file a grievance regarding any of these incidents. She quit on May 17, 1997.

Ellison signed the out-of-work book at the union several days later but did not accept any dispatches for more than a year. In March 1998 Ellison wrote a letter to the union, referring to the harassment and requesting a plan to ensure her safety. On May 17, 1999, Ellison sued the union, Jackson, Ballam, Price, and a number of Price supervisors and employees, asserting discrimination and sexual harassment in violation of AS 18.80.220 and 18.80.260, and other claims.[2]

Ellison met with union officials in July 1999, after which the union's attorney investigated her sexual harassment complaint. Although he did not conclude that sexual harassment occurred, he recommended a safety plan for Ellison. Ellison eventually agreed to the union's plan, at least insofar as

she agreed to accept future work under the terms of the plan (and without prejudice to her pending lawsuit), and accepted a dispatch in September 1999. Although Ellison did not want to work with any of the union members named in her lawsuit, Ballam also was dispatched to the same job, apparently because the union was contractually obligated to do so since Ballam was specifically requested. Ballam was uncomfortable working with Ellison and quit shortly after they were put on the same crew.

After the job ended, Ellison and the union disagreed over the terms of her safety plan. Ellison did not accept any other dispatches and eventually decided not to work through the union, in part for family reasons.

On September 13, 1999, Jackson and Ballam provided Ellison with separate offers of judgment for $500 each that she did not accept. On November 2, 1999, the union, Jackson, and Ballam provided a joint offer of judgment that Ellison also did not accept.

Price and its employees settled before trial. Jackson and Ballam successfully moved for summary judgment on all claims. At trial, Superior Court Judge Mary E. Greene ruled in favor of the union, concluding it was not liable under AS 18.80.220 or .260. The court awarded the union, Jackson, and Ballam attorney's fees under Rules 68 and 82. Ellison appeals.

### III. STANDARD OF REVIEW

■ We review findings of fact under a clearly erroneous standard. To reverse, we must have a "definite and firm conviction that a mistake has been made," giving "due regard to the trial court's opportunity to judge the credibility of the witnesses."[3]

■ Statutory interpretation[4] and a grant of summary judgment[5] present questions of law that we review de novo. The independent standard of review also applies to considering whether the trial court properly applied the law when awarding attorney's fees[6]

---

**2.** Ellison amended her complaint in December 2000, adding more claims.

**3.** *Municipality of Anchorage v. Gregg,* 101 P.3d 181, 186 (Alaska 2004) (internal quotation marks omitted).

**4.** *VECO, Inc. v. Rosebrock,* 970 P.2d 906, 921 n. 32 (Alaska 1999).

**5.** *Grant v. Anchorage Police Dep't,* 20 P.3d 553, 555 (Alaska 2001).

**6.** *Glamann v. Kirk,* 29 P.3d 255, 259 (Alaska 2001).

and in determining a settlement offer's compliance with Rule 68.[7] "On questions of law, we do not defer to the lower court's decision, but adopt the rule of law most persuasive in light of precedent, reason, and policy."[8]

## IV. DISCUSSION

### A. Ellison's Claim for Discrimination Under AS 18.80.220

Ellison argues that the union discriminated against her in violation of AS 18.80.220 by failing to respond to a sexually hostile work environment at HCCP.[9] Ellison does not assert that the union created the discriminatory work environment but rather that it had an affirmative duty to remedy harassment. The union, on the other hand, contends that a union cannot be held liable for passively acquiescing in an employer's hostile work environment under AS 18.80.

#### 1. Standard for union liability for an employer's discrimination

Alaska Statute 18.80.220(a)(2) establishes that "it is unlawful for ... (2) a labor organization, because of a person's sex ... to discriminate in any way against one of its members or an employer or an employee." We have not decided whether AS 18.80.220(a)(2) requires a union to investigate and remedy discrimination by the employer without being requested to do so. Since this is an unresolved question under Alaska law, we look to similar federal cases under Title VII for guidance.[10]

Ellison bases her arguments for union liability primarily on *Goodman v. Lukens Steel Co.*[11] and *Thomas v. Anchorage Telephone Utility*.[12] However, in both these cases, the unions were held liable for more than mere inaction in the face of an employer's discrimination. Although in *Goodman* the district court held the union liable for mere passivity, the United States Supreme Court did not address "this rather abstract observation" because the union's actions involved "far more than mere passivity."[13] The union had refused to file proffered grievances based on racially discriminatory discharges and racial harassment, and refused to include assertions of racial discrimination in grievances that asserted other contract violations.[14] The Court concluded that "[a] union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, or in deference to the perceived desires of its white membership, is liable under ... Title VII."[15]

Similarly, in *Thomas*, we based a union's liability for discrimination on its actions, rather than on mere passivity.[16] Because the union participated in negotiating the collective bargaining agreement, we held it could be liable for an allegedly discriminatory provision, even though the employer proposed the provision.[17] Although we stated that "a union may be liable ... for acquiescing in discriminatory *noncontractual policies or conduct* on the part of the employer,"[18] this was unnecessary to our holding in *Thomas*. Consequently, we did not define the circumstances under which union acquiescence might be sufficient to impose liability for an employer's conduct, nor did we require unions to take the initiative to remedy workplace discrimination.

7. *Thomann v. Fouse*, 93 P.3d 1048, 1050 (Alaska 2004).

8. *Norcon, Inc. v. Kotowski*, 971 P.2d 158, 164 n. 3 (Alaska 1999).

9. Under AS 18.80.220, a hostile work environment exists when there is "discriminatory behavior sufficiently severe or pervasive to alter the conditions of the victim's employment." *French v. Jadon, Inc.*, 911 P.2d 20, 28 (Alaska 1996).

10. *E.g., Alaska State Comm'n for Human Rights v. Yellow Cab*, 611 P.2d 487, 490 (Alaska 1980).

11. 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987).

12. 741 P.2d 618 (Alaska 1987).

13. 482 U.S. at 666, 107 S.Ct. 2617 (internal quotations marks omitted).

14. *Id.*

15. *Id.* at 669, 107 S.Ct. 2617 (quotation marks and brackets omitted).

16. 741 P.2d at 630–31.

17. *Id.* at 631, 741 P.2d 618.

18. *Id.* (emphasis added) (citation omitted).

Most federal courts that have addressed the issue have not imposed liability on a union for failing to remedy a discriminatory work environment.[19] In *EEOC v. Pipefitters Ass'n Union Local 597*, the Seventh Circuit explained that unions have no duty to remedy racial or sexual harassment because they typically do not control the workplace:

> The employer is in a better position than the union to prevent or eliminate harassment because it can discipline its employees; the union cannot. If a worker complains to the union that he is being harassed, all the union can do is file a grievance on his behalf against the employer; the union cannot eliminate the harassment itself—that is the company's responsibility.... A further consideration is that members of different unions, or union and nonunion workers, often find themselves working at the same site.... The pipefitters union had no control over workers belonging to other unions.... [20]

However, the court noted that its analysis might differ in cases where a collective bargaining agreement delegates more power to a union to control the workplace.[21]

In addition, the Seventh Circuit did not require a union to take the initiative to address workplace harassment to the limited extent that it can because "inaction, unless invidious, is not discrimination in any accepted sense of the term." [22] Imposing such an affirmative duty might force a union to take sides in conflict with its statutory duty to fairly represent all workers.[23] The Seventh Circuit thus concluded that "[i]f [a union] discriminates in the performance of its agency function, it violates Title VII, but not otherwise." [24] Because no one attempted to file a grievance or even complained to a union official in his representative capacity in *Local 597*, the union had no duty under Title VII to address the racial harassment at the workplace.[25]

Ellison cites to a number of cases that she asserts establish that "a union may not sit idly by when it knows or should know" of workplace sexual discrimination. First, none of these cases holds that constructive notice alone is enough to impose liability on a union for an employer's discrimination.[26] Second, even though some of these cases ostensibly follow the acquiescence theory, they base Title VII liability on the unions' own actions, not simply their inaction in the face of actual knowledge of discrimination.[27] The unions

**19.** *See EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 660 (7th Cir.2003) (rejecting argument that union has affirmative duty to investigate and rectify discrimination); *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 832–33 (8th Cir.2002) (holding that because employee did not ask union to file a grievance, union had no duty to remedy sexual harassment); *Anjelino v. New York Times Co.*, 200 F.3d 73, 95–96 (3d Cir.1999) (holding union was not liable because it did not instigate or actively support the discrimination and the employer was responsible for assigning work and ensuring a discrimination-free workplace); *cf. York v. American Tel. & Tel. Co.*, 95 F.3d 948, 956–57 (10th Cir.1996) (adopting so-called acquiescence theory but not-ing "mere inaction does not constitute acquiescence" and requiring "(1) knowledge that prohibited discrimination may have occurred and (2) a decision not to assert the discrimination claim"). *Contra Howard v. Int'l Molders & Allied Workers Union*, 779 F.2d 1546, 1548, 1553 (11th Cir.1986) (holding union liable for failing to use "all reasonable efforts" to end employer's use of racially discriminatory test for promotion, although no members had asked union to pursue grievances).

**20.** *Local 597*, 334 F.3d at 659.

**21.** *Id.* at 661.

**22.** *Id.* at 660.

**23.** *Id.* at 661.

**24.** *Id.* at 659.

**25.** *Id.* at 658, 660–61. Although one worker complained to his supervisor/union steward about the racially hostile environment, his complaint was limited to graffiti that addressed him specifically and was apparently directed to the union steward/supervisor in his supervisory capacity because the supervisor ordered it painted over. *Id.* at 660.

**26.** Because the union and employers have different roles in the workplace, Ellison's citations to cases laying out the standards for employer liability for wrongful termination or discriminatory harassment are inapposite. *E.g., Charles v. Interior Reg'l Hous. Auth.*, 55 P.3d 57, 61 (Alaska 2002); *Norcon, Inc. v. Kotowski*, 971 P.2d 158, 172 (Alaska 1999); *cf. Woods v. Graphic Communications*, 925 F.2d 1195, 1201 (9th Cir.1991) (discussing union's liability for creation of hostile work environment by its stewards).

**27.** *Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842, 853 (8th Cir.1994); *Woods*, 925 F.2d at 1201; *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir.1991); *Rainey*

themselves were accused of discriminating in these cases by denying members' requests to pursue grievances out of deference to the desires of the harassers [28] or because of policies not to assert sexual harassment-based grievances.[29]

 We are persuaded by the consensus view of the federal authorities represented by such cases as *Local 597*,[30] *Thorn v. Amalgamated Transit Union*,[31] and *Anjelino v. New York Times Co.*[32] Therefore, we conclude that under AS.18.80.220, a union may only be liable on account of an employer's discriminatory harassment when (1) the harassed worker asks the union to take action within its representative capacity, such as by filing a grievance, and (2) the union decides not to pursue the complaint for discriminatory reasons.

### 2. Ellison cannot meet this standard.

 The superior court concluded that "[w]hat the stewards knew, without more, was insufficient to alert them that Price had permitted a gender-based hostile work environment." Ellison contests a number of the superior court's factual findings underlying this conclusion and argues that the union's actions amount to more than mere passivity because the stewards knew about the harassment and did not report it to Price.[33] However, even considering the facts in the light most favorable to her, Ellison has not de-

scribed anything more than inaction in the face of knowledge of discrimination, which we have concluded is insufficient to establish union liability.

Even if the union knew of the discrimination, the record does not reflect that she asked the union to do more than it did. Although she told the union stewards about five incidents and they were aware of others, she never requested that the union file a grievance. Furthermore, the superior court found that she was satisfied with the union's response to at least two of these reports. In the spring or summer of 1996, she was satisfied with Ballam's response to a co-worker's alleged spreading of lies. In April 1997 she informed Jackson of a co-worker calling her a bitch during a dispute but ultimately agreed to accept an apology and to continue working with the co-worker.

Ellison claims that she did request that the union do more and that union officials promised to investigate. But the only evidence she points to is fabrication shop foreman Gyuriscko's deposition testimony that "it seemed Lori wasn't satisfied with what the stewards were doing for her." This single statement is insufficient to establish that she asked the union to do more. Moreover, there was evidence to suggest that the union thought more was being done; the superior court found that Jackson "reasonably be-

---

*v. Town of Warren*, 80 F.Supp.2d 5, 18–19 (D.R.I. 2000); *EEOC v. Regency Architectural Metals Corp.*, 896 F.Supp. 260, 269 (D.Conn.1995).

**28.** *Marquart*, 26 F.3d at 845, 853 (holding plaintiff's complaint made out prima facie case where she alleged union would not process her grievance because alleged perpetrators were favored union members); *Woods*, 925 F.2d at 1198, 1201 (holding union's actions amounted to "more than mere passivity" where shop stewards engaged in harassment and union repeatedly ignored requests to file grievance because it did not want employer to discipline any union member for racial harassment) (internal quotation marks omitted); *Regency Architectural Metals*, 896 F.Supp. at 269 (holding union liable for not pursuing sexual harassment grievance in deference to perceived desires of male membership).

**29.** *Johnson*, 931 F.2d at 209 (holding union unlawfully retaliates under Title VII when it chooses not to grieve discrimination complaint because of employer's desire that it not do so when the claim is pending before the state Division of

Human Rights); *Rainey*, 80 F.Supp.2d at 10, 18–19 (denying summary judgment to union under "deliberate acquiescence" theory because plaintiff alleged union repeatedly refused to file grievance, telling plaintiff it was not grievable).

**30.** 334 F.3d at 661.

**31.** 305 F.3d at 832–33.

**32.** 200 F.3d at 95–96.

**33.** Ellison challenges the superior court's conclusion that imputing what the stewards knew to the union was "impossible" because of federal preemption under the Labor Management Relations Act since the task "would necessarily involve interpreting the union's internal documents and the collective bargaining agreement." We do not reach this argument because even if the stewards' knowledge is imputed to the union, Ellison has not stated a claim for union liability under state law.

lieved" Price would investigate her complaints following the first May 1997 meeting.

In addition, Ellison has not proven that the union failed to pursue any of her reports of the harassment at HCCP for discriminatory reasons. Ellison asserts the union purposefully tried to keep information about the harassment from Price officials. There is evidence that a few Price supervisors, who were union members, indicated a desire to handle the incidents "in-house," which Ellison believed meant within the union. However, although these people were union members, they were not agents of the union, such that their statements could be imputed to the union.[34] Moreover, even if the union did want to try to resolve incidents "in-house" before involving Price, Ellison has not presented any evidence that the union was treating her reports any differently than male members' complaints or grievances not based on unlawful harassment. Moreover, notwithstanding the "in house" comments, Ellison was not intimidated into not involving Price; in fact, she reported numerous incidents to her Price supervisors. Thus, Ellison has not stated a claim for union liability.

Lastly, Ellison describes the union's actions after she left HCCP as evidence of the union's conduct that amounted to more than mere acquiescence in Price's discrimination. Again, Ellison does not point to any evidence that she asked the union to file a grievance or pursue other action against Price. The superior court noted Ellison's "legal theory is not entirely clear," but because the court found no duty to act before she left, the court concluded that the union had no duty to act afterward either. If Ellison is arguing that the union permitted a hostile environment to exist at the job site affording her with no choice but to quit, the union's actions after she left seem irrelevant. She has not argued that persisting discrimination kept her from working further union jobs. Since Ellison has not articulated her argument in a manner that can be considered, the superior court did not err in denying this aspect of her claim.

### B. Ellison's Aiding and Abetting Discrimination Claims

Ellison also argues that the union, Jackson, and Ballam aided and abetted discrimination in violation of AS 18.80.260. Ellison's argument as to the union and the stewards is essentially the same argument she makes for liability under AS 18.80.220, asserting that the union and stewards knew about the discrimination and deliberately kept such knowledge from Price officials.

■ We have not defined the elements for an aiding and abetting discrimination claim. Alaska Statute 18.80.260 provides: "It is unlawful for a person to aid, abet, incite, compel, or coerce the doing of an act forbidden under this chapter or to attempt to do so." We look to the Restatement (Second) of Torts for guidance, which other courts have adopted in interpreting state statutes on aiding and abetting discrimination.[35] Section 876(b) concludes that aiding and abetting liability occurs when the actor "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other."[36]

Ellison has made no attempt to satisfy this standard. She points out that the stewards had knowledge of discriminatory actions and did not report them, but this does not amount to "substantial encouragement or assistance." Therefore, the superior court did

---

34. *See Alaska Pulp Corp. v. United Paperworkers Int'l Union,* 791 P.2d 1008, 1012 (Alaska 1990) (Moore, J., concurring) ("Workers are not the agents of their union.").

35. *E.g., Failla v. City of Passaic,* 146 F.3d 149, 157–58 (3d Cir.1998) (predicting New Jersey would adopt the Restatement view); *Fiol v. Doellstedt,* 50 Cal.App.4th 1318, 58 Cal.Rptr.2d 308, 312–13 (1996) (adopting the Restatement view, at least in part).

36. RESTATEMENT (SECOND) OF TORTS § 876 (1979) describes liability for people acting in concert:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

not err in finding that the union was not liable for aiding and abetting discrimination against Ellison.

For the same reasons, the evidence is insufficient for Ellison to assert claims for aiding and abetting discrimination against the stewards Jackson and Ballam. Although Ellison asserts that the stewards wanted to obstruct any inquiry, she provides little evidence, other than a purported desire to keep her concerns within the union. Because we conclude the evidence is insufficient, we do not decide whether AS 18.80.260 imposes individual liability on co-workers. Thus, the superior court properly granted summary judgment in favor of Jackson and Ballam.

### C. Attorney's Fee Awards

Ellison makes a number of arguments seeking to reverse or reduce the attorney's fees granted to the union and stewards. The superior court awarded the stewards Civil Rule 82 fees of $200 for work performed before their September 13, 1999 settlement offers and Civil Rule 68(b)(1) fees of $142,500 for worked performed after their offers. The union was awarded $4,625.25 in Rule 82 fees for work before its November 2, 1999 offer and $227,272.12 in Rule 68 fees for work after its offer. We agree with Ellison's contention that the union and stewards could not receive fees under both Civil Rule 82 and Civil Rule 68, but reject her other arguments on the applicability of Rule 68 to her case.

#### 1. Attorney's fees cannot be awarded under both Rule 68 and Rule 82.

Ellison argues that awarding attorney's fees to the union and stewards under both Rules 68 and 82 was improper. However, Jackson and Ballam argue that a prevailing party may receive attorney's fees under both Rules 68 and 82 when the rules are applied to different time periods for work performed before and after an offer.

■ Rule 68(c) (in the version in effect prior to April 15, 2005) provides that the party may receive the greater of Rule 82 or Rule 68 fees, but not both:

> If an offeror receives costs and reasonable actual attorney fees under paragraph (b), that offeror shall be considered the prevailing party for purposes of an award of attorney fees under Civil Rule 82. Notwithstanding paragraph (b), if the amount awarded an offeror for attorney fees under Civil Rule 82 is greater than a party would receive under paragraph (b), the offeree shall pay to the offeror attorney fees specified under Civil Rule 82 and is not required to pay reasonable actual attorney fees under paragraph (b). A party who receives attorney fees under this rule may not also receive attorney fees under Civil Rule 82.

The plain language of the rule prohibits receiving fees under both rules. Therefore, granting fees under both rules was error. The stewards did not argue that their fee award calculated under Rule 82 would be higher than under Rule 68(b)(1), and the superior court concluded that the union could not get higher fees under Rule 82 than under Rule 68. Therefore, we strike the fees awarded under Rule 82 and uphold the fees awarded under Rule 68. In the stewards' case, the superior court determined that award was $142,500; in the union's case, $227,272.12.

#### 2. The post–1997 version of Rule 68 applies to Ellison's case.

Ellison also argues that any attorney's fees should be calculated based on the pre-August 1997 version of AS 09.30.065. She notes that because the legislature indicated that the amended version of AS 09.30.065 would apply only to causes of action *accruing* on or after August 7, 1997,[37] her claim should be considered under the old version because it accrued before this date.

■ Upon the passage of the amended AS 09.30.065, which was meant to change Civil Rule 68, we altered the rule so that the legislative changes applied to all cases *filed* on or after August 7, 1997.[38] As the superior court correctly observed, we extended the coverage of the amendment, rather than substantively changing what the legislature had done. This extension of coverage was permissible because we have procedural rule-

---

**37.** Ch. 26, § 55, SLA 1997.

**38.** Alaska Supreme Court Order No. 1281 ¶ 17 (August 7, 1997) (emphasis added).

making authority through the Alaska Constitution.[39] Because Ellison filed her case in 1999, the superior court was correct to apply the post-August 7, 1997 version of Rule 68.

### 3. Rule 68(b)(1) applies to settlement offers made before Rule 26 initial disclosures.

■ Ellison next contends that because the 1999 settlement offers were served before the Rule 26 initial disclosures were made, those offers should not be considered for Rule 68 attorney's fees purposes. She claims that the legislature intended the timing of any offer to occur after the initial disclosures so that the parties would have sufficient information to value their claims and evaluate any settlement offers. She further alleges that because she could not properly evaluate the settlement offers made before the initial disclosures, she rejected the offers and then somehow the defendants were able to use her rejection as a means of later conspiring and leveraging attorney's fees against her.

Ellison's arguments are without merit. We recently held that the rate specified in Rule 68(b)(1) applies to offers made before Rule 26 disclosures.[40] Such offers are timely because, in the language of the rule, they are served "no later than 60 days after both parties made the disclosures required by Civil Rule 26."[41] Additionally, Ellison's claim that the defendants exploited Rules 26 and 68 by acting in concert to leverage their case against her is highly speculative. She provides no support for her allegations other than the stewards' and union's hiring of separate defense counsel and their subsequent rejection of her later settlement offers. Thus, the superior court properly awarded fees under Rule 68(b)(1).

### 4. Rejecting the joint offer triggered Rule 68 for purposes of awarding fees to the union.

Ellison's final argument is that the joint offer by the union and stewards should not trigger Rule 68 for purposes of the union's fee award.[42] Ellison argues that this joint offer raised apportionment problems.

■ In *John's Heating Service v. Lamb,* we noted that in the context of an offer by joint offerors to a single offeree, a rejection of that offer triggers Rule 68 if two factors are satisfied.[43] First, the settlement offer must sufficiently indicate that all claims between the parties would be resolved if the offer were accepted.[44] Second, the offer must present no apportionment difficulties by forcing multiple offerees to decide how to divide the proceeds or allocate responsibility for payment.[45] We found that the offer in *John's Heating Service* presented no apportionment problem, not because the *defendant* was a single entity as Ellison claims, but because the *offeree* was a single entity.[46] Because the offer made to Ellison proposed settlement of all of her claims, and because Ellison as the offeree was a single entity, her rejection of the joint offer was sufficient to trigger Rule 68.

## V. CONCLUSION

We AFFIRM the superior court's judgment in favor of the union, Jackson, and Ballam on Ellison's AS 18.80.220 and 18.80.260 claims. Because we conclude that Ellison has not stated a claim under state law, we need not reach the union's arguments that her claim is outside the statute of limitations or is preempted by the federal Labor Management Relations Act.

**39.** Alaska Const. art. IV, § 15.

**40.** *Cook Schuhmann & Groseclose, Inc. v. Brown & Root, Inc.*, 116 P.3d 592 (Alaska 2005).

**41.** Alaska R. Civ. P. 68(b)(1).

**42.** This argument does not apply to the stewards' Rule 68 fee awards because their Rule 68 awards were not based on this joint offer but rather on their separate settlement offers made on September 13, 1999.

**43.** 46 P.3d 1024, 1042 (Alaska 2002) (citing *Taylor Constr. Servs., Inc. v. URS Co.*, 758 P.2d 99, 102 (Alaska 1988)).

**44.** *Id.*

**45.** *Id.*

**46.** *Id.*

We also AFFIRM the superior court's awards of Rule 68 attorney's fees in favor of the union, Ballam, and Jackson, but REVERSE the awards of Rule 82 attorney's fees.